Access Funding, LLC, et al. v. Chrystal Linton, et al., No. 5, September Term, 2022

**ARBITRATION – EXISTENCE OF AGREEMENT TO ARBITRATE – FRAUD – TRANSFER OF STRUCTURED SETTLEMENT PAYMENT RIGHTS –** Court of Appeals reaffirmed that question of whether valid agreement to arbitrate exists is question for trial court, not arbitrator, to determine. It is well settled that where party denies existence of valid agreement to arbitrate, court—not arbitrator—determines if agreement exists. Court held that where respondents alleged trial court's approval of transfer of their structured settlement payment rights was procured through fraud and deceit, respondents denied existence of valid arbitration agreement and question of whether valid arbitration agreement exists is question for court to determine, not arbitrator. Because respondents alleged fraud as to arbitration clause in agreement in particular, existence of valid arbitration agreement is in dispute and issue of existence of agreement to arbitrate is matter for court to decide. In addition, because plain language of arbitration clause expressly conditions arbitration on closure of transaction, by challenging validity of court's approval of transfer, respondents challenge existence of agreement to arbitrate, which is issue for court and not arbitrator to determine. In other words, for variety of reasons, Court concluded that trial court erred in compelling arbitration of question of whether arbitration clause in agreements is valid.

Circuit Court for Baltimore City
Case No. 24-C-16-003894

Argued: September 9, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 5

September Term, 2022

_____

ACCESS FUNDING, LLC, ET AL.

v.

CHRYSTAL LINTON, ET AL.

_____

Watts
Hotten
Booth
Gould
Eaves
Adkins, Sally D. (Senior Judge, Specially Assigned)
McDonald, Robert N. (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Watts, J.
Gould, J., dissents.

_____

Filed: December 1, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Generally used to resolve tort cases, structured settlements are voluntary agreements under which an injured party receives periodic payments, rather than one lump sum payment, as settlement of a claim. With a structured settlement, the party providing the settlement buys an annuity that provides regular payments to the injured party over time. The theory is that spreading payments over an extended period of time will provide better assurance of future financial stability for an injured party, who may need payment for medical bills or be vulnerable as a result of an injury.[1] The use of structured settlements first became popular in the 1980s as a result of a federal tax incentive framework introduced to encourage use of such settlements. See James Gordon, Enforcing and Reforming Structured Settlement Protection Acts: How the Law Should Protect Tort Victims, 120 Colum. L. Rev. 1549, 1552 (2020). Because structured settlements are transferrable assets, the buying and selling of structured settlements became a highly profitable venture. See id.

A Maryland statute regulates the sale of structured settlement payment rights and requires court authorization of the transfer of such rights, upon the court's consideration of factors, including whether the party purporting to transfer structured settlement rights has received independent professional advice. See Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") § 5-1102. Companies that are in the business of purchasing payment rights from structured settlement annuitants are called factoring companies.

---

[1]A structured settlement provides a series of tax-free payments to the recipient of such a settlement and is intended to provide long-term financial security to an injured party. See, e.g., Linton v. Consumer Prot. Div., 467 Md. 502, 525, 225 A.3d 456, 470 (2020) (Booth, J., dissenting).

Factoring companies often use contracts called Purchase and Sale Agreements to consummate the purchase of structured settlements. These agreements generally contain arbitration clauses.

The arbitration clause at issue in this case stems from transactions between lead paint tort plaintiffs who received structured settlements and affiliated factoring companies that specialize in purchasing structured settlement rights. Although the case raises interesting questions concerning arbitration and agreements transferring structured settlement benefits for lump sum payments, at the heart of the matter is a straightforward issue: Whether in bringing an action against a factoring company and others, the plaintiffs challenged the existence of an agreement to arbitrate and, if so, whether the trial court erred in granting a motion to compel arbitration upon finding that an arbitrator was to determine "arbitrability." The Court of Special Appeals was not persuaded by the position that an arbitrator should decide the issue of whether a valid agreement to arbitrate exists, and neither are we.

In this case, Crystal Linton[2] and Dimeca D. Johnson, Respondents, who had been lead paint tort plaintiffs, obtained structured settlements with periodic payments over time as the resolution of lead paint exposure claims. Subsequently, Linton and Johnson signed agreements purporting to transfer their rights to the structured settlement payments to Access Funding, LLC and Assoc, LLC in exchange for discounted lump sum cash payments. Later, Linton and Johnson filed a class action complaint in the Circuit Court for

_____

[2]With the exception of the caption of this case, Linton's first name appears in the record as "Crystal," not "Chrystal."

Baltimore City against Access Funding, LLC, and its affiliates Access Holding, LLC, Reliance Funding, LLC, Assoc, LLC, and En Cor, LLC (collectively, "Access"), Anuj Sud and Sudlaw, LLC (collectively, "Sud"), and Charles E. Smith and CES Law Group, LLC (collectively, "Smith"), Petitioners, alleging negligence; negligent misrepresentation; fraud, misrepresentation, and deceit; constructive fraud; and civil conspiracy in connection with procurement of the agreements.

Because the agreements contained arbitration clauses, Petitioners filed motions to compel arbitration and to stay the proceedings. Before the circuit court ruled on the motion to compel arbitration, the parties filed a joint motion for approval of a class action settlement. While the joint motion was pending, the Consumer Protection Division of the Office of the Maryland Attorney General ("the CPD"), Respondent, moved to intervene in the case, and the circuit court granted the motion. As an intervenor, the CPD opposed the joint motion to approve the settlement.[3] Nonetheless, after a hearing, in February 2018, the circuit court approved the settlement. The Court of Special Appeals reversed the circuit court's approval of the settlement, and this Court affirmed the judgment of the Court of Special Appeals, see Linton v. Consumer Prot. Div., 467 Md. 502, 521, 225 A.3d 456, 467 (2020) ("Linton I"), resulting in the case being remanded to the circuit court for further

---

[3]Before Linton and Johnson filed the class action complaint, the CPD had filed an enforcement action against Access, alleging that Access had engaged in unfair or deceptive trade practices in violation of the Maryland Consumer Protection Act. Six months after Linton and Johnson filed the complaint, the Federal Consumer Financial Protection Bureau initiated an action in federal court against the same defendants.

proceedings.[4]

On remand, Petitioners renewed the motions to compel arbitration and stay the proceedings. The circuit court granted the motions, ruling that the question of "arbitrability" must be determined by an arbitrator and not the court. The Court of Special Appeals reversed and remanded the case to the circuit court for further proceedings, holding that the circuit court erred in compelling arbitration because a court, not an arbitrator, must decide the question of whether a valid arbitration agreement exists. See Linton v. Access Funding, LLC, 253 Md. App. 507, 510, 517, 526, 268 A.3d 937, 939, 943, 948 (2022). Petitioners filed the instant petition for a writ of *certiorari,* which we granted. See Access Funding, LLC v. Linton, 478 Md. 244, 273 A.3d 890 (2022).

Against this backdrop, as to the predominant issue in this case, we hold that where Linton and Johnson alleged that the circuit court's approval of the transfer of their structured settlement payment rights was procured through fraud and deceit, Linton and Johnson denied the existence of a valid agreement to arbitrate, and the question of whether a valid arbitration agreement exists is a question for the court to determine, not the arbitrator. Because Linton and Johnson alleged fraud as to the arbitration clause of the agreement in particular, the existence of a valid arbitration agreement is in dispute and the issue is a matter for the court to decide. In addition, because the plain language of the arbitration clause expressly conditions arbitration on closure of the transaction, by

---

[4]In Linton I, 467 Md. at 521, 523-24, 225 A.3d at 467, 469, this Court concluded that provisions in the settlement were unenforceable because they purported to preclude the CPD from pursuing remedies such as disgorgement and restitution and, as such, directly contravened the CPD's statutory authority to sanction Access for its wrongful conduct.

- 4 -

challenging the validity of the circuit court's approval of the transfer, Linton and Johnson challenge the existence of an agreement to arbitrate, which is an issue for the court, and not an arbitrator, to determine.

We conclude that the question of whether an agreement to arbitrate exists, *i.e.*, whether the arbitration clause in the agreements is valid, has been raised and is a question for the circuit court, not the arbitrator, to determine. It is well settled that where a party denies the existence of an arbitration agreement, the court—not an arbitrator—determines if the agreement exists. In this case, we conclude that the circuit court erred in compelling arbitration of the question of whether the arbitration clause in the agreements is valid. Accordingly, we affirm the judgment of the Court of Special Appeals.

## BACKGROUND

This case has a lengthy factual and procedural history which was set forth in Linton I. See Linton I, 467 Md. at 505-15, 225 A.3d at 458-64. We need describe only the background relevant to resolution of the issue before us, namely, whether the court or an arbitrator must decide the validity of the arbitration clause in the agreements.

### Structured Settlements

We begin with a brief overview of Maryland law with respect to structured settlement transactions. In 2000, seeking to protect vulnerable consumers and to ensure fairness in the transactions, the General Assembly enacted the Maryland Structured Settlement Protection Act ("the MSSPA"). See 2000 Md. Laws 2076 (Vol. III, Ch. 366, H.B. 357); CJ §§ 5-1101 to 5-1112. The Fiscal Note of House Bill 357, which became the MSSPA, stated that the purpose of the bill was as follows:

This bill provides that a direct or indirect transfer of structured settlement payment rights is effective if the transfer has been authorized in an order of a court based on a finding that:

- the transfer is necessary, reasonable, or appropriate;

- the transfer is not expected to subject the payee, the payee's dependents, or both to undue or unreasonable financial hardship in the future;

- the payee received independent professional advice regarding the legal, tax, and financial implications of the transfer; and

- the transferee disclosed to the payee the discounted present value.

Fiscal Note (Revised), H.B. 357 (2000), available at https://mgaleg.maryland.gov/2000rs/ fnotes/bil_0007/hb0357.PDF [https://perma.cc/YX8P-UYHD].

The MSSPA provides that a "structured settlement" is "an arrangement for periodic payment of damages for personal injury established by a settlement or judgment in resolution of a tort claim[.]" CJ § 5-1101(i)(1). The MSSPA states that "structured settlement payment rights" are "the rights to receive periodic payments, including lump-sum payments under a structured settlement, whether from the settlement obligor or the annuity issuer, if[,]" among other things, "[t]he structured settlement agreement was approved by a court or responsible administrative authority in this State[.]" CJ § 5-1101(l). Pursuant to CJ § 5-1102(a), "[a] direct or indirect transfer of structured settlement payment rights to a transferee is effective as provided in th[e] subtitle." Under CJ § 5-1102(b), "[a] structured settlement obligor or annuity issuer may not make any payment directly or indirectly to a transferee of structured settlement payment rights unless the transfer is authorized in an order of a court based on" several findings.

At the time of the transfers at issue in this case, Md. Code Ann., Cts. & Jud. Proc. (1974, 1998 Repl. Vol., 2000 Supp.) § 5-1102(b) required that the court not authorize a transfer unless the court made findings that:

(1) The transfer is necessary, reasonable, or appropriate;

(2) The transfer is not expected to subject the payee, the payee's dependents, or both, to undue or unreasonable financial hardship in the future;

(3) The payee received independent professional advice regarding the legal, tax, and financial implications of the transfer; and

(4) The transferee disclosed to the payee the discounted present value.

2000 Md. Laws 2079 (Vol. III, Ch. 366, H.B. 357).

Also, at the time of the transfers in this case, the MSSPA defined "independent professional advice" as follows:

"Independent professional advice" means advice of an attorney, certified public accountant, actuary, or other licensed professional adviser:

(1) Who is engaged by a payee to render advice concerning the legal, tax, and financial implications of a transfer of structured settlement payment rights;

(2) Who is not affiliated with or compensated by the transferee of the transfer; and

(3) Whose compensation is not affected by whether a transfer occurs.

Md. Code Ann., Cts. & Jud. Proc. (1974, 1998 Repl. Vol., 2000 Supp.) § 5-1101(c); 2000 Md. Laws 2077 (Vol. III, Ch. 366, H.B. 357).

In 2016, after the transfers in this case occurred, the General Assembly amended the MSSPA to increase the protections for transferors of structured settlements. See 2016 Md. Laws 7391-7404 (Vol. IX, Ch. 721, H.B. 535); 2016 Md. Laws 7404-17 (Vol. IX, Ch. 722,

- 7 -

S.B. 734). Among other things, the General Assembly added a provision stating "that it is necessary to regulate transfers of structured settlement payment rights to: (1) Ensure that the transfers are effectuated on fair and reasonable terms and are in the best interests of payees; and (2) Protect payees against deceptive practices." CJ § 5-1101.1 (paragraph breaks omitted). The General Assembly redefined "independent professional advice" from "advice concerning the legal, tax, and financial implications of a transfer of structured settlement payments rights" to "advice concerning whether a proposed transfer of structured settlements payment rights would be in the best interest of the payee, taking into account the welfare and support of the payee's dependents[.]" 2016 Md. Laws 7393, 7406; see also CJ § 5-1101(d)(1).

In addition, with the 2016 amendments, the General Assembly expanded the findings that the trial court is required to make under CJ § 5-1102(b) before authorizing a transfer of structured settlement payments rights. As amended, CJ § 5-1102(b) requires more extensive "express findings" by providing:

> A structured settlement obligor or annuity issuer may not make any payment directly or indirectly to a transferee of structured settlement payment rights unless the transfer is authorized in an order of a court based on express findings that:
>
> > (1) The transfer is necessary, reasonable, and appropriate and in the best interest of the payee, taking into account the welfare and support of the payee's dependents;
> >
> > (2) The financial terms of the transfer agreement are fair to all parties, taking into account:
> >
> > > (i) The difference between the amount payable to the payee and the discounted present value of the payments to be transferred; and

(ii) The discount rate applicable to the transfer;

(3) The payee received independent professional advice concerning the proposed transfer; and

(4) At least 10 days before the date on which the payee signed the transfer agreement, the transferee provided to the payee a separate disclosure statement, in at least 14 point boldface type, that states:

(i) The amounts and due dates of the structured settlement payments to be transferred;

(ii) The aggregate amount of the payments to be transferred;

(iii) The discounted present value of the payments to be transferred;

(iv) The amount payable to the payee in exchange for the payments to be transferred;

(v) An itemized listing of all brokers' commissions, service charges, application fees, processing fees, closing costs, filing fees, administrative fees, notary fees, and other charges payable by the payee or deductible from the gross amount otherwise payable to the payee, except attorney's fees and related disbursements;

(vi) The transferee's best estimate of the amount of any attorney's fees and disbursements payable by the payee or deductible from the gross amount otherwise payable to the payee;

(vii) The net amount payable to the payee after deduction of all commissions, fees, costs, expenses, and charges described in items (v) and (vi) of this item;

(viii) The discount rate applicable to the transfer, which shall be disclosed in the following statement: "Based on the net amount that you will receive from us and the amounts and timing of the structured settlement payments that you are transferring to us, you will, in effect, be paying interest to us at a rate of __ percent per year.";

(ix) The amount of any penalty or liquidated damages payable by the payee in the event of any breach of the transfer agreement by the payee; and

(x) A statement that the payee has the right to cancel the transfer agreement, without penalty or further obligation, at any time before the transfer is authorized by a court under this subtitle.

In 2016, the General Assembly also amended the MSSPA to require that factoring companies register with, and be approved by, the Office of the Attorney General. See 2016 Md. Laws 7394, 7398-7403, 7406, 7411-16; CJ §§ 5-1101(g), 5-1107 to 5-1110. "The Attorney General may suspend or revoke the registration of a structured settlement transferee, or deny an application for registration, if the Attorney General finds that the transferee or any of its employees, affiliates, or agents has" engaged in an enumerated list of activities, including making a referral to a payee "for independent professional advice concerning a proposed transfer subject to this subtitle other than a referral to a local or state bar association or not-for-profit lawyer referral service unaffiliated with any structured settlement transferee that makes referrals to attorneys, certified public accountants, or licensed financial consultants[.]" CJ § 5-1110(a)(4). In addition, the General Assembly enacted CJ § 5-1112, which authorizes the Attorney General to promulgate regulations to enforce the MSSPA. See 2016 Md. Laws 7404, 7417.[5]

---

[5]Similarly, in October 2015, the Standing Committee on Rules of Practice and Procedure ("the Rules Committee") submitted to this Court its One Hundred Eighty-Ninth Report, in which it, among other things, proposed a new Chapter 1300 to Title 15 of the Maryland Rules concerning structured settlements. See Standing Comm. on Rules of Practice and Proc., 189th Report, at 2 (Oct. 15, 2015), available at https://mdcourts.gov/sites/default/files/rules/reports/189th.pdf [https://perma.cc/7AQJ-B9QG]. In the report, the Rules Committee explained that the "impetus" for the new proposed chapter "was the exposure of" the absence of any Rules governing the judicial procedure by which structured settlements are transferred "and the harmful consequences therefrom, in two recent publications – one in the August 25, 2015 edition of the *Washington Post* and

**The Transfers and the Purchase and Sale Agreements**

In this case, as resolution of lead paint exposure claims, Linton and Johnson, residents of Baltimore City, each received a settlement that included compensation in the form of structured settlement annuity payments.  As victims of lead paint exposure, both Linton and Johnson suffer cognitive impairment.  According to the complaint, Linton was in special education for approximately fourteen years, reads at a fourth-grade level, and is functionally illiterate.  Johnson did not complete the tenth grade of high school, has been diagnosed with attention deficit hyperactivity disorder and other disorders, and has tested with a below average IQ and achievement scores.

Linton and Johnson, and others who had obtained structured settlements after resolving lead paint exposure claims, signed "Purchase and Sale Agreements" purporting to transfer their right to the structured settlement annuity payments to Access in exchange for a discounted lump sum cash payment.  Access, a Delaware limited liability company established in 2012, is a factoring company.  "[B]etween 2013 and 2015, Access obtained judicial approval to acquire 163 structured settlements from 100 victims and obtained $33.8 million in future payment rights . . . in exchange for $7.7 million in cash."  Linton I, 467 Md. at 506 n.1, 225 A.3d at 458 n.1 (citation omitted).

---

one in the earlier June 2015 edition of the Maryland Bar Journal."  Id. at 4.  On December 7, 2015, this Court adopted Chapter 1300 of Title 15, with the new Rules taking effect on January 1, 2016.  See Court of Appeals of Maryland, Rules Order, at 1 (Dec. 15, 2015), available at https://www.mdcourts.gov/sites/default/files/rules/order/189ro.pdf [https://perma.cc/TP4L-MMF7].  Among other things, Maryland Rule 15-1304 requires that an independent professional advisor submit an affidavit that includes, among other things, "an affirmation that affiant's compensation is not affected by whether the proposed structured settlement transfer occurs[.]"

In two transactions, through Purchase and Sale Agreements signed on October 28, 2013, and December 10, 2013, Access obtained from Linton the right to a total of $122,677.50 in future monthly settlement payments. The payments had a discounted present value of $110,491.31. Under the agreements, Access was to provide only $48,543.51 in cash to Linton, or slightly more than 40% of the discounted present value of the transferred payments.[6]

In a transaction initiated through a Purchase and Sale Agreement signed on January 15, 2014, Access obtained from Johnson the right to $143,666.88 in future monthly settlement payments. The payments had a discounted present value of $116,162.18. Access was to provide Johnson only $40,000 in cash, or slightly more than one-third of the discounted present value of the transferred payments.[7]

The Purchase and Sale Agreements signed by Linton and Johnson providing for the transfer of their future settlement payments to Access contained the following identical arbitration clause:

> 8.17 Arbitration Clause. Once your transaction has closed, any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents, successors or assigns of the other, arising from or relating in any way to this Agreement or any prior agreement (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief) including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement or any prior agreement, shall be resolved by mandatory binding arbitration. For matters that could be brought in your local small claims court, you have the option of proceeding in the small claims court rather than proceeding in arbitration. This arbitration provision cannot be used to bypass state and

_____

[6]The complaint filed by Linton and Johnson refers to only one of the two transfers signed by Linton, the December 10, 2013 transfer.

[7]Johnson allegedly received only $37,000 of the $40,000 owed.

federal laws requiring court approval of this transaction. The arbitration shall be conducted by JAMS Arbitration ("JAMS") under the Code of Procedure in effect at the time the Claim is filed. JAMS rules and forms may be obtained and Claims may be filed at any JAMS office, online at www.jamsadr.org, or by telephone 1-800-352-5267. You will have the right to counsel, the right to be heard in front of a neutral arbitrator, and you will have the opportunity to participate in the selection of the arbitrator. You will retain all the remedies that you are afforded under local, state and federal law. The arbitration shall take place in your hometown or, in the JAMS office closest to where you are located. The arbitrator shall apply the law of the jurisdiction where we sought court approval of this Agreement. We or you may, upon approval of the other, substitute another nationally recognized, independent arbitration organization that uses a similar code or procedure. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Any arbitration award shall be final, and judgment upon the award may be entered in a court having jurisdiction. No Claim submitted to arbitration is heard by a jury, and no Claim may be brought as a class action or as a private attorney general. You do not have the right to act as a class representative or participate as a member of a class of claimant with respect to any Claim.

On the first page of each Purchase and Sale Agreement, directly above the parties' signature lines, was a disclosure that the seller (transferor) acknowledged "that the closing and funding of the Transaction described herein and in the Transaction Documents is expressly contingent upon entry of a Court Order, as described in Article 5.5 of this Purchase and Sale Agreement." Article 1.1 of the agreements reiterated that "[a]t Closing, Seller hereby sells, assigns, transfers, and conveys to the Purchaser and Purchaser purchases and acquires from Seller, all of Seller's right, title and interest in and to the Assignment Payments, including, without limitation, the Seller's right to receive the Assigned Payments."

Article 2 of the Purchase and Sale Agreements, titled "Closing," contains a section that defined closing as follows:

2.1 Closing Defined. The closing of the Transaction described in this Agreement (the "Closing") shall occur on a date designated by the Purchaser, which date shall be as soon as reasonably practicable after entry of the Court Order and verification that the Annuity Issuer will comply therewith, and after the Purchaser, in its sole and absolute discretion, has determined that all of the conditions and contingencies required by this Agreement and the other Transaction Documents have been satisfied, have occurred, and/or have been performed and complied with, as the case may be, and that no event or condition has occurred or exists that would require this Agreement to be terminated. Seller agrees to cooperate with Purchaser and use Seller's best efforts to secure the Court Order and close the Transaction in accordance with this Agreement.

Article 5 of the agreements is titled "Conditions to Closing." As a condition to closing, Article 5.5 specifically stated that the transactions must be approved by a court in accordance with any applicable state transfer statute:

Seller understands and acknowledges that the Transaction contemplated by this Agreement must be approved by a court of competent jurisdiction in accordance with an applicable state transfer statute of a state of the United States of America and must be structured, consummated, closed and approved in accordance with certain applicable laws of the United States of America.

Article 5.5 provided that "a further condition and contingency" to closing was that "the Purchaser and/or the Seller shall have procured and/or received a court order, judgment, or decree (the Court Order, as previously defined) approving the sale, assignment, and transfer of the Assigned Payments to Purchaser."

**The Complaint**

In the complaint, Linton and Johnson alleged that they and other putative class members had been "lured into consumer transactions" with Access "to sell their structured

settlement annuity contracts for grossly unfair and unconscionably low sums."[8]  According to the complaint, Access and Smith "engaged in a scheme of knowingly failing to advise all Plaintiffs and the courts of their friendly and collusive relationship with one another" and Access "engaged in a common scheme to fail to pay the reported present values for the already unfair transactions to the Plaintiffs."[9]

In Linton I, 467 Md. at 505-06, 225 A.3d at 458, we stated that, although the fraud claim had "several strains[,]" it was mainly

> based on evidence of a *modus operandi* in which (1) most of the assignors were young victims of lead paint poisoning whose ability to understand the economic impact of the assignment was severely limited; (2) those individuals were actively solicited by Access; (3) as a condition to implementing an assignment of structured settlement benefits, Maryland law requires approval of the proposed assignment by a Circuit Court but prohibits a court from approving an assignment unless the assignor has received "independent professional advice regarding the legal, tax, and financial implications of the transfer" (Md. Code, § 5-1102 of the Cts. & Jud. Proc. Article (CJP)); (4) independent professional advice means advice from a licensed professional adviser who is engaged by the assignor and is not affiliated with or compensated by the assignee (CJP § 5-1101(d)); (5) most of the assignments at issue involved an Access agent posing as an independent professional adviser who gave no (or wholly inadequate) independent advice to the assignors; and (6) the amount paid for the assignment of benefits was unconscionably inadequate.

(Footnote omitted).

---

[8]In Linton I, 467 Md. at 508, 225 A.3d at 460, we indicated that there are approximately 100 putative class members "who, between January 1, 2012 and July 6, 2016, transferred structured settlement payment rights obtained in settlement of a personal injury claim to Access."

[9]The complaint included the following seven counts: (1) negligence against  Smith; (2) negligent misrepresentation against Smith; (3) negligent misrepresentation against Access; (4) fraud, misrepresentation, and deceit against Smith; (5) fraud, misrepresentation, and deceit against Access; (6) constructive fraud against Smith; and (7) civil conspiracy against all Petitioners, *i.e.*, Access,  Smith, and Sud.

In the complaint, Linton and Johnson alleged that Smith acted as an attorney who had agreed to provide independent professional advice concerning the sale of their structured settlement annuity contracts and that, although he represented to each plaintiff and to Maryland trial courts that he was independent and not affiliated with Petitioners, "Smith in fact had very close business and personal ties with all of the Defendants[, *i.e.*, Petitioners]." To satisfy the requirement of the MSSPA that any prospective transferor receive independent professional advice prior to the transfer, Smith would submit to the approving court a signed letter stating that he had explained the financial and legal implications of the proposed transfer and that the transferor understood "all aspects" of the transfer.

According to the complaint, in seeking judicial authorization for the transfers, Access provided to the Circuit Court for Prince George's County letters from Smith on CES Law Group, LLC's letterhead, in which Smith stated that he: spoke with Linton and Johnson; reviewed on Linton's and Johnson's behalf the proposed transactions; and explained to them the financial, legal, and tax implications of the transactions. In the letters, Smith stated that Linton and Johnson each "indicated that [they] understood every aspect of the transaction and the implications of said transaction" and that he was "not affiliated with nor compensated by the transferee of th[e] transfer and [his] compensation [was] not affected by whether a transfer occurs." According to the complaint, neither Linton nor Johnson recalled ever having met with Smith. Also, according to the complaint, Smith never advised a single transferor not to transfer their structured settlement or to pursue other options and he failed to review the contracts that the transferors signed with

- 16 -

Access, thereby failing "to ensure that they fully understood the terms of the contract and the proposed transaction."

In paragraph 81 of the complaint, Linton and Johnson specifically alleged:

In using Defendant Charles Smith, Defendant Access Funding not only ensured that its customers would not receive true independent professional advice, but it also sought to prevent Plaintiffs from fully understanding and appreciating the Purchase agreement's provision with respect to binding arbitration and/or limiting class action rights, which were not in the Plaintiffs' best interests.

In the complaint, Linton and Johnson alleged that at the same time that Smith posed as an independent adviser for potential customers, he sent invoices for his services directly to Access. In Linton I, 467 Md. at 506 n.1, 225 A.3d at 458 n.1, this Court noted that Access paid Smith for each transferor he "advised," and that Access paid Smith more than $50,000 in total. In the complaint, Linton and Johnson also alleged that Smith was connected with Access's principals on a personal level. Smith attended the wedding of Access Funding's Chief Executive Officer, represented that CEO in a traffic matter, had a prior business relationship with Access Funding's Chief Operating Officer/Chief Marketing and Sales Officer, and was close personal friends with and had a prior business relationship with Access's counsel. At no point did anyone disclose this relationship to the customers or the court.

According to the complaint, Access specifically targeted victims of lead exposure in Baltimore City who had structured settlements in place, devising a plan to target those residents through "various illegal and deceptive ways in order to have them cash in their structured settlement annuity contracts for a single, inadequate, lump sum payment." In

- 17 -

the complaint, Linton and Johnson alleged that Access searched court records to identify lead paint exposure victims, sent unsolicited advertisements to the victims to entice them to sell their structured settlement payments, and advertised on billboards in Baltimore City. Access also allegedly sent unsolicited checks to prospective customers with its phone number on them. In addition, Access allegedly promised advance payments, vacations, and dinners, and engaged in other tactics, to induce the consent of prospective customers, but never disclosed such promises or tactics to the courts in the course of seeking approval for transfers.

With Smith's letters, Access represented to the circuit court that its customers had received independent professional advice within the meaning of the MSSPA. The circuit court relied on the letters in authorizing the transfers. In the complaint, Linton and Johnson alleged that had they been aware of Smith's affiliation with Access, they would not have entered into the transactions because they would not have felt that they were receiving "a fair deal." Moreover, they alleged that had the court been aware of the relationship, it would not have approved the transfers.[10]

---

[10]In its opinion, the Court of Special Appeals noted that Sud, Access's former attorney, has been disbarred and that "Smith, [] Sud, and Raffi Michael Boghosian (a founder, part owner, and chief operating officer of Access) recently were charged in the Circuit Court for Baltimore City with Theft Scheme Over $10,000 and Conspiracy to Commit Theft Scheme Over $100,000." Linton, 253 Md. App. at 513 n.7, 268 A.3d at 941 n.7 (citation omitted). According to entries on Maryland Judiciary Case Search on the Judiciary's website, on November 9, 2022, in Case No. 121354003, Smith was found guilty of theft scheme over $100,000 and in Case No. 121354002, Sud was found guilty of theft scheme over $100,000 and conspiracy to commit theft scheme over $100,000. Case Search does not reflect the disposition of the charge of conspiracy to commit theft scheme over $100,000 as to Smith or the disposition of the charges described above as to Boghosian in

## Proceedings in the Circuit Court

In August 2016, shortly after the complaint was filed, Petitioners filed motions to compel arbitration and to stay the case. The circuit court stayed the case pending a ruling on the motions to compel arbitration. While the case was stayed, the parties negotiated a settlement and, on March 28, 2017, the parties filed a joint motion for preliminary approval of a class action settlement. As we described in Linton I, 467 Md. at 508, 225 A.3d at 460:

> The settlement class was to consist of all individuals who, between January 1, 2012 and July 6, 2016, transferred structured settlement payment rights obtained in settlement of a personal injury claim to Access. It was estimated that there were 100 such individuals. The total gross payout by Access, taken entirely from indemnity insurance policies, would be $1.1 million, of which $330,000 would be paid to Class Counsel as attorneys' fees. Of the balance, the Class Administrator would receive "the reasonable costs of class notice and administrative expense and taxes," for which no estimate was then given, and each of the two named plaintiffs would receive $500 as a service award. Whatever was left would be distributed to the estimated 100 class members on a pro rata basis set forth in the Stipulation of Settlement.

In May 2016, two months before Linton and Johnson filed the complaint in this case, the CPD filed an enforcement action under the Maryland Consumer Protection Act, Md. Code Ann., Comm. Law (1975, 2013 Repl. Vol.) ("CL") §§ 13-101 to 13-501, against Access in the circuit court based on the same alleged misconduct. See Linton I, 467 Md. at 507, 225 A.3d at 459. In its complaint, the CPD alleged that, "in soliciting and consummating the assignments, Access engaged in unfair or deceptive trade practices in violation of CL § 13-303." Linton I, 467 Md. at 507, 225 A.3d at 459. The CPD sought

Case No. 121354004. Pursuant to Maryland Rule 8-202(a), Smith, Sud, and Boghosian each have the right to file a notice of appeal in the Circuit Court for Baltimore City within thirty days after sentencing to appeal any judgment of conviction.

various forms of relief, including having the court enjoin Access from continuing its alleged misconduct, restoring to the transferors a future stream of structured settlement payments, and compensating the transferors through restitution and the disgorgement of funds from Access. See id. at 507, 225 A.3d at 459.[11] On April 13, 2017, the CPD filed a motion to intervene in the case. The circuit court granted the motion to intervene and the CPD opposed the joint motion to approve the class action settlement. After holding a hearing, on February 9, 2018, the circuit court issued an order certifying the class and approving the settlement. See Linton I, 467 Md. at 512, 225 A.3d at 462.

### Appellate Proceedings

The CPD appealed, and in an unreported opinion filed on April 22, 2019, the Court of Special Appeals affirmed in part and reversed in part. See Consumer Prot. Div. v. Linton, No. 2609, Sept. Term, 2017, 2019 WL 1770524, at *13 (Md. Ct. Spec. App. Apr. 22, 2019). The Court of Special Appeals held that the settlement improperly interfered with the CPD's (and the Federal Consumer Financial Protection Bureau's) enforcement authority because it purported to settle the claims of those who were not parties to the agreement (i.e., the agencies) and the agencies' rights to seek restitution were not something that the plaintiffs could settle or bargain away. See id. at *6.[12]

---

[11]Six months after Linton and Johnson filed the class action complaint, "the Federal Consumer Financial Protection Bureau (CFPB), chartered by Congress to enforce the Consumer Federal Protection Act of 2010[,]" filed a similar action in the United States District Court for the District of Maryland "against the same defendants, for the same misconduct and seeking essentially the same relief[.]" Linton I, 467 Md. at 507, 225 A.3d at 459.
[12]The Court of Special Appeals affirmed the circuit court's decision permitting the CPD's intervention. See Linton, 2019 WL 1770524, at *6.

The Court of Special Appeals explained:

> The point of settlements is to settle, and the Class Action Defendants understandably sought in this agreement to achieve total peace. But parties can only settle their own claims—they can't settle the claims of those who aren't parties to the agreement or otherwise not theirs to settle. The [CPD] and the Bureau weren't parties to the settlement and their rights to seek restitution w[ere] not something the Class could bargain away. And because the settlement effectively preempted a major portion of the pending claims being pursued by the [CPD] and the Bureau when it assigned any benefit from those actions to Access and the Class Defendants—*i.e.*, the targets of the agencies' enforcement efforts—the judgment approving the settlement must be reversed.

Id. As a result of the Court of Special Appeals's holding, the case was remanded for further proceedings. See id. at *13.

"Neither side was entirely happy with the Court of Special Appeals judgment," and Access and the CPD each filed a petition for a writ of *certiorari* in this Court. Linton I, 467 Md. at 515, 225 A.3d at 464. We granted both petitions. See id. at 515, 225 A.3d at 464. We vacated the Court of Special Appeals's judgment and remanded the case to the circuit court, also concluding that the settlement was improper. See id. at 521, 523-24, 225 A.3d at 467, 469. We explained that provisions in the settlement were unenforceable, stating:

> The parties can agree, if they wish, not to accept any compensation from recoveries by CPD, provided there is an adequate disclosure of the prospect that there may be such recoveries through remedies not sought in the Linton action. With respect to recoveries through disgorgement/restitution, however, they cannot preclude CPD from pursuing such remedies or direct that any such recoveries be handed over to Access or anyone else (other than the settling plaintiffs), which would directly contravene the statutory authority of CPD to sanction Access for its wrongful conduct. That alone requires that the Circuit Court's approval of the Stipulation of Settlement be reversed.

- 21 -

Id. at 521, 225 A.3d at 467 (citation omitted).

## Subsequent Proceedings in the Circuit Court

On remand, the parties did not seek to reach a new settlement. Rather, following a status conference, the circuit court ordered, among other things, that Petitioners were to file renewed motions to compel arbitration. Access, Sud, and Smith all filed separate motions to compel arbitration and to stay proceedings, and Linton and Johnson opposed the motions. On December 15, 2020, the circuit court held a hearing on the motions.

On January 15, 2021, the circuit court issued a memorandum opinion and order granting the motions to compel arbitration and staying the proceedings. The circuit court addressed three distinct issues. First, the circuit court ruled "that arbitrability in this case must be decided by an arbitrator and not the court[,]" relying on the language of the arbitration clauses themselves, which calls for an arbitrator to decide the applicability of the arbitration clause itself and the validity of the entire agreement. In addition, relying on case law indicating that, unless there is an allegation of fraud in the inducement as to the arbitration clause itself, an arbitrator decides such issues, the circuit court determined that, because Linton and Johnson alleged in the complaint fraud and misrepresentation as to the agreements as a whole and not to "the arbitration clauses separately and specifically[,] the arbitrability must be decided by the arbitrator."

Second, the circuit court addressed whether Smith had standing to compel arbitration and ruled that each Petitioner had standing to enforce the arbitration clause of

the agreements.[13]  Finally, the circuit court concluded that Petitioners had not waived the right to enforce arbitration.[14]

**Opinion of the Court of Special Appeals**

Linton and Johnson appealed.  On January 26, 2022, the Court of Special Appeals reversed the circuit court's judgment, holding that the circuit court erred in compelling arbitration.  See Linton, 253 Md. App. at 510, 517, 268 A.3d at 939, 943.[15]  As an initial matter, the Court of Special Appeals noted that, although the arbitration clause in the agreements provided that the Federal Arbitration Act ("the FAA"), 9 U.S.C. § 1, *et seq.*,

---

[13]The circuit court stated that, even though Smith and his law firm were not parties to the agreements (and thus not parties to the arbitration clauses), Linton and Johnson, as signatories, were equitably estopped from contending "that a non-signatory cannot move to compel arbitration when the signatory's claims arise out of and relate directly to the written agreement or when the signatory raises allegations of substantially interdependent or concerted misconduct by both the non-signatory and one or more signatories to the contract."  In addition, the circuit court determined that Sud and his law firm were agents/attorneys of Access and had the right to enforce the arbitration clauses in the agreements.

[14]The circuit court explained that "[a] litigant may waive [the] right to arbitrate by invoking the litigation machinery[,]" but concluded that Petitioners did not do so because they did not file an answer, any dispositive motion, or a motion *in limine* and the court never resolved any merit-based issues in the case.  The circuit court also determined that Petitioners' right to arbitration was preserved in the joint settlement agreement.

[15]The Court of Special Appeals explained that the only issue before it was the circuit court's ruling that the arbitration clause required that the issue of arbitrability in the case be determined by an arbitrator and not the court.  See Linton, 253 Md. App. at 517, 268 A.3d at 943.  The circuit court's rulings that all Petitioners had standing to invoke the arbitration clause and that none of Petitioners had waived their right to enforce arbitration were not at issue.  See id. at 517, 268 A.3d at 943.

In addition, the Court of Special Appeals declined to consider Linton's and Johnson's argument "that the arbitration clause should not be enforced because it 'contravenes' the public policy behind the Structured Settlement Transfer Act" because the argument was not raised in the circuit court and consequently was not preserved for appellate review.  Id. at 527 n.16, 268 A.3d at 949 n.16.

- 23 -

governs, this Court has held that when interpreting Section 2 of the FAA,[16] state courts are not bound by the procedural provisions of the FAA and instead may apply their own procedures. See Linton, 253 Md. App. at 519, 268 A.3d at 944. The Court of Special Appeals stated that, under Maryland's arbitration act and case law, when a court is confronted with a petition to compel arbitration, its task is narrowly focused on determining only whether a valid arbitration agreement exists. See id. at 521, 268 A.3d at 946.

The Court of Special Appeals concluded that, in ruling that "arbitrability" must be determined by an arbitrator, the circuit court conflated two issues by using the term "arbitrability": "*first*, whether there is an agreement to arbitrate at all and *second*, whether a particular dispute falls within the scope of an arbitration agreement." Id. at 521-22, 268 A.3d at 946 (emphasis in original). The Court of Special Appeals explained that the first question "is always for the court, and not the arbitrator, to decide" and that the first question is the only relevant question in this case. Id. at 521-22, 268 A.3d at 946 (cleaned up).

The Court of Special Appeals explained that the parties' arguments in this case as to whether a valid arbitration agreement existed flow from the Supreme Court's holding in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967), which was followed

---

[16]Section 2 of the FAA provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

by this Court's holding in Holmes v. Coverall N. Am., Inc., 336 Md. 534, 649 A.2d 365 (1994). See Linton, 253 Md. App. at 522, 268 A.3d at 946. The Court of Special Appeals explained that, in Prima Paint, the United States Supreme Court held that a challenge to the enforceability of a contract must be heard by an arbitrator in the absence of a claim that the arbitration clause itself is unenforceable. See Linton, 253 Md. App. at 522-23, 268 A.3d at 946-47. The Court of Special Appeals stated that Petitioners contended that this case is just like Prima Paint and Holmes and argued that, as such, the circuit court did not err in compelling arbitration because Linton and Johnson did not allege that the arbitration clause itself was obtained by fraud but instead contended that the whole agreement was procured by fraud. See Linton, 253 Md. App. at 524, 268 A.3d at 947. The Court of Special Appeals explained that Linton and Johnson pointed out that they have alleged that the arbitration clause itself was obtained by fraud and therefore this case falls within an exception to the holdings set forth in Prima Paint and Holmes. See Linton, 253 Md. App. at 524-25, 268 A.3d at 947-48.

The Court of Special Appeals concluded that the Prima Paint and Holmes line of cases does not apply because the cases are premised on the circumstance that the underlying agreement and the arbitration clause were entered into at arm's length. See Linton, 253 Md. App. at 525, 268 A.3d at 948. The Court of Special Appeals explained that this was not the case with the instant agreements because they are not effective unless the circuit court approves the transfers. See id. at 525, 268 A.3d at 948. The Court of Special Appeals pointed out that the court's authorization was required under the express terms of the arbitration clause and was required by statute for approval of the transfer. See id. at 525,

268 A.3d at 948.  The Court of Special Appeals concluded that, for these reasons, <u>Prima Paint</u> and <u>Holmes</u> did not control the analysis of whether the arbitration clause came into being.  <u>See</u> <u>Linton</u>, 253 Md. App. at 525, 268 A.3d at 948.

Rather than relying on <u>Prima Paint</u> and <u>Holmes</u>, the Court of Special Appeals turned to principles embodied in the Maryland Uniform Arbitration Act, a provision of which states that a written agreement to arbitrate any controversy "is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract."  <u>Linton</u>, 253 Md. App. at 525, 268 A.3d at 948 (quoting CJ § 3-206(a)).  The Court of Special Appeals concluded that Linton and Johnson had alleged grounds to rescind the agreements, as the agreements "expressly conditioned the obligation to arbitrate on the 'closing' of the transaction[.]"  <u>Id.</u> at 525, 268 A.3d at 948.  The Court of Special Appeals determined that, with these grounds, Linton and Johnson "have denied the existence of a valid arbitration agreement, and that puts to the court, not the arbitrator, the question of whether the arbitration agreement exists."  <u>Id.</u> at 526, 268 A.3d at 948 (cleaned up).

The Court of Special Appeals compared this case to <u>Spahr v. Secco</u>, 330 F.3d 1266, 1272 (10th Cir. 2003), a case in which the United States Court of Appeals for the Tenth Circuit held that <u>Prima Paint</u> did not apply and that the trial court correctly denied a motion to arbitrate.  <u>See</u> <u>Linton</u>, 253 Md. App. at 526, 268 A.3d at 949.  The Court of Special Appeals explained that, in <u>Spahr</u>, the plaintiff alleged that he lacked the mental capacity to enter into a stock share purchase agreement and asserted that the arbitration clause in the agreement was not enforceable.  <u>See</u> <u>Linton</u>, 253 Md. App. at 526, 268 A.3d at 949.  The Court of Special Appeals explained that the Tenth Circuit determined that "a mental

capacity challenge, by definition, can logically be directed only at the entire contract[.]" Linton, 253 Md. App. at 526, 268 A.3d at 949. The Court of Special Appeals stated that, in this case, Linton and Johnson allege that Petitioners fraudulently interfered with the "court's statutory obligation to find, as a condition of approving the transfers, that a professional who was not affiliated with [Petitioners] provided advice 'concerning the legal, tax, and financial implications' of the transfer, which necessarily include the implications of agreeing to arbitrate." Id. at 526, 268 A.3d at 949 (citation omitted). As a final matter, the Court of Special Appeals stated that compelling arbitration at this stage would essentially permit Petitioners "to circumvent the court authorization process mandated by the [MSSPA,]" which the arbitration clause itself states should not be permitted. Id. at 527, 268 A.3d at 949.

**Petition for a Writ of *Certiorari***

On March 2, 2022, Petitioners together petitioned for a writ of *certiorari*, raising the following two issues:

> 1. Did the [Court of Special Appeals] err in ruling that [the] Circuit Court must determine whether an arbitration agreement exists between the Parties when Respondents did not challenge the validity or enforceability of the underlying agreements containing the arbitration clauses in their Complaint, but instead affirmed the agreements when they sued Petitioners for fraud in the inducement and sought damages, not rescission or avoidance of those agreements; and moreover, the agreements are the subject of enrolled judgments, and as such, their validity and enforceability may not be collaterally attacked in any court unless the court that issued the judg[]ment lacked fundamental jurisdiction to enter the judgment, which is not the case here?
>
> 2. Did the [Court of Special Appeals] err in ruling that the Circuit Court must decide the existence of an arbitration agreement when well-established Federal and Maryland law mandates that the arbitrator and not the court

- 27 -

decides the issue of arbitrability when Respondents executed agreements containing arbitration clauses that expressly stated that the arbitrator shall decide the arbitrability of the parties' dispute, and Respondents have only alleged fraud and misrepresentation as to the agreements as a whole and not with respect to the arbitration clause separately and specifically?[17]

On April 25, 2022, we granted the petition. See Access Funding, LLC v. Linton, 478 Md. 244, 273 A.3d 890 (2022).

## DISCUSSION

### The Parties' Contentions

Petitioners contend that the Court of Special Appeals erred in holding that the court, not the arbitrator, must determine the validity of the arbitration clause in the Purchase and Sale Agreements. Petitioners argue that, where the parties agree that an arbitrator is to decide the arbitrability of a dispute, a court must enforce the agreement as written. Petitioners maintain that this is the case unless a plaintiff has "specifically and separately" alleged in a complaint that the plaintiff's "agreement to arbitrate was procured by fraud and not merely that the contract as a whole was procured by fraud." According to Petitioners, an arbitration clause is a severable contract independently enforceable from the main contract. Petitioners contend that Linton and Johnson failed to assert a basis for

---

[17]In an answer to the petition, the CPD opposed the grant of *certiorari* but stated that, if this Court were to grant the petition,

it would be desirable and in the public interest for this Court to address a legal theory newly advanced by Access Funding in its petition. Specifically, this Court should determine whether, under its prior decision in *LVNV Funding v. Finch*, 463 Md. 586 (2019) ("*LVNV*"), Ms. Linton and Ms. Johnson are precluded, by the court orders authorizing the transfer of their future settlement payments to Access Funding, from asserting that they did not validly agree to arbitrate.

- 28 -

avoidance or rescission of the arbitration clauses themselves, as opposed to the agreements as a whole, and that, as such, the arbitration clauses remain valid.

In addition, Petitioners argue that Linton and Johnson ratified or affirmed the agreements by accepting the benefit of payments made to them under the agreements and that, by seeking damages arising out of alleged breach of common law duties, they are not seeking rescission of the agreement. Petitioners assert that Linton and Johnson have not sought to void the arbitration clauses or the agreements as a whole and that to do so would be to engage in an impermissible collateral attack on enrolled judgments approving the transfers of their structured settlement rights. Petitioners assert that an enrolled judgment may be collaterally attacked only where the court that entered the judgment lacked jurisdiction to do so, which Linton and Johnson would not be able to show here as the circuit court had the power to approve the transfer of their structured settlement rights. Petitioners argue that the question of whether Smith provided independent professional advice regarding the transactions was "intrinsic" to the court's decisions because it was an issue to be decided by the court before approving the transfers and that allegations of intrinsic fraud are not sufficient to collaterally attack an enrolled judgment.

Linton and Johnson respond that they have sufficiently alleged or established grounds to deny the existence of a valid and enforceable arbitration agreement. Linton and Johnson argue that the Court of Special Appeals correctly determined that they challenged the existence of a valid arbitration agreement by alleging that a necessary prerequisite— valid court approval of the transfer resulting in the closing of the transaction—was procured through fraud and deceit of them and the court. Linton and Johnson assert that to

deny the validity of an agreement to arbitrate, they were not required to challenge the validity of the arbitration clauses separately from the underlying agreements where they have alleged that Petitioners committed fraud and deceit in obtaining the court's approval of the transfers.

In addition, Linton and Johnson point out that they have expressly challenged the validity or enforceability of the arbitration clause in the complaint and that the complaint contains numerous allegations of fraud and deceit as to Smith, who was required to provide independent professional advice as to the implications of the transfers and agreements, including the arbitration clause. Linton and Johnson assert that the Court of Special Appeals properly determined that the allegations of fraud in the complaint go to both the validity of the agreements as a whole and that of the arbitration clauses in particular.[18] Like Linton and Johnson, the CPD contends that it was for the circuit court to decide whether Linton and Johnson validly agreed to arbitrate the claims asserted in this case and asks that this Court affirm the judgment of the Court of Special Appeals.

**Standard of Review**

An appellate court's review of a trial court's order compelling arbitration "extends only to a determination of the existence of an arbitration agreement." Holloman v. Circuit City Stores, Inc., 391 Md. 580, 588, 894 A.2d 547, 551 (2006) (cleaned up). In a case

---

[18]Linton and Johnson contend that Petitioners failed to preserve for appellate review arguments that: (1) they were required to seek rescission of the agreements; (2) they cannot collaterally attack enrolled judgments; and (3) by seeking monetary damages, they affirmed the agreements, including the arbitration clauses. Linton and Johnson argue that, in any event, none of the above contentions negates the conclusion that a court must determine whether a valid agreement to arbitrate exists.

concerning whether a valid agreement to arbitrate exists, "the interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court." Walther v. Sovereign Bank, 386 Md. 412, 422, 872 A.2d 735, 741 (2005) (cleaned up). Similarly, a "trial court's decision as to whether a particular dispute is subject to arbitration is a conclusion of law, which we review *de novo*." Holloman, 391 Md. at 588, 894 A.3d at 551 (cleaned up).

**Analysis**

*Introduction*

Petitioners have raised two multi-layered questions that essentially ask whether the Court of Special Appeals erred in concluding that the circuit court must determine whether a valid arbitration agreement exists between the parties. We answer "no." We hold that where Linton and Johnson alleged that the circuit court's approval of the transfer of their structured settlement payment rights was procured through fraud and deceit, Linton and Johnson denied the existence of a valid agreement to arbitrate, and the question of whether a valid arbitration agreement exists is a question for the court to determine, not the arbitrator. Because Linton and Johnson alleged fraud as to the arbitration clause in the agreements in particular, the existence of a valid arbitration clause is in dispute and the issue is a matter for the court to decide. In addition, because the plain language of the arbitration clause expressly conditions arbitration on closure of the transaction, by challenging the validity of the circuit court's approval of the transfer, Linton and Johnson challenge the existence of an applicable agreement to arbitrate. Again, this is an issue for the court and not an arbitrator to determine. Accordingly, we affirm the judgment of the

Court of Special Appeals.

### *Arbitration in Maryland*

As we have previously described, arbitration is "the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them." Holloman, 391 Md. at 590, 894 A.2d at 552 (cleaned up). Thus, "[t]he issue of whether an agreement to arbitrate exists is governed by contract principles." Id. at 590, 894 A.2d at 552 (citations omitted); see also Cheek v. United Healthcare of Mid-Atl., Inc., 378 Md. 139, 147, 835 A.2d 656, 661 (2003) ("The determination of whether there is an agreement to arbitrate, of course, depends on contract principles since arbitration is a matter of contract."). As such, the parties "cannot be required to submit any dispute to arbitration that [they have] not agreed to submit." Gold Coast Mall, Inc. v. Larmar Corp., 298 Md. 96, 103, 468 A.2d 91, 95 (1983) (citations omitted).

In this case, the arbitration clause in the agreements provided: "This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ('FAA')." In Walther v. Sovereign Bank, 386 Md. 412, 423, 872 A.2d 735, 742 (2005), we recognized that "[t]he FAA applies to nearly all arbitration agreements, and, like all federal law, it preempts inconsistent state law." (Citation omitted). Section 2 of the FAA, 9 U.S.C. § 2, provides that a written agreement between the parties to arbitrate a dispute is "valid, irrevocable, and enforceable, save upon any grounds as exist at law or in equity for the revocation of any contract[.]" The "United States Supreme Court has made clear state courts are [] bound to recognize and enforce" Section 2 of the FAA. Walther, 386 Md. at 423, 872 A.2d at

- 32 -

742 (citation omitted). Nevertheless, in enforcing Section 2 of the FAA, "state courts are not bound by the federal procedural provisions of the FAA, which are found in §§ 3 and 4 of the FAA, but may generally apply their own procedures." Walther, 386 Md. at 423, 872 A.2d at 742 (citation omitted). Thus, "in enforcing § 2 of the FAA, we [] look to [] pertinent Maryland law relating to arbitration agreements to decide whether the circuit court properly" compelled arbitration. Id. at 423, 872 A.2d at 742.

The Maryland Uniform Arbitration Act, CJ §§ 3-201 to 3-234 ("the MUAA"), which was enacted in 1965, "was purposefully meant to mirror the language of the FAA[,]" Walther, 386 Md. at 423-24, 872 A.2d at 742, and "embodies a legislative policy favoring enforcement of executory agreements to arbitrate[,]" Gold Coast Mall, 298 Md. at 103, 468 A.2d at 95 (citations omitted). Like Section 2 of the FAA, the MUAA provides that a written agreement to arbitrate a dispute between the parties "is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract." CJ § 3-206(a). The MUAA "strictly confines the function of the court in suits to compel arbitration to the resolution of a single issue—is there an agreement to arbitrate the subject matter of a particular dispute." Gold Coast Mall, 298 Md. at 104, 468 A.2d at 95 (citation omitted). CJ § 3-207 of the MUAA permits a party to petition a court to compel arbitration and requires the court to deny the petition if it determines that a valid arbitration agreement does not exist, stating:

> (a) If a party to an arbitration agreement described in § 3-202 of this subtitle refuses to arbitrate, the other party may file a petition with a court to order arbitration.

- 33 -

(b) If the opposing party denies the existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists.

(c) If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition.

In other words, CJ § 3-207 gives the court the authority to determine whether a valid arbitration agreement exists.

We have expressly recognized that "courts play a leading role in cases involving arbitration [] in deciding arbitrability of a dispute." Balt. Cnty. Fraternal Ord. of Police Lodge No. 4 v. Balt. Cnty., 429 Md. 533, 549, 57 A.3d 425, 434 (2012). This is so "because the existence of an agreement to arbitrate is a threshold issue, and the courts must have authority to assess, independently of the arbitrator's point of view, whether or not the parties ever reached such an agreement." Id. at 549, 57 A.3d at 434 (cleaned up). In deciding an issue as to whether arbitration is required, the court is "limited to determining only one thing: whether a valid arbitration agreement exists[.]" Id. at 550, 57 A.3d at 435 (cleaned up). In doing so, the court must take care "not to stray into the merits of any underlying agreements." Id. at 550, 57 A.3d at 435 (cleaned up). Stated otherwise, consideration of a motion to compel arbitration may involve two separate, and distinct, issues: (1) whether an agreement to arbitrate exists; and (2) whether a particular dispute falls within the scope of the arbitration agreement. See id. at 549-50, 57 A.3d at 434-35; Cheek, 378 Md. at 159-60, 835 A.2d at 668; Gold Coast Mall, 298 Md. at 103-04, 468 A.2d at 95. As is plain, the first issue—whether an agreement to arbitrate exists—is always a matter to be decided by the court, and not an arbitrator. See Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, 429 Md. at 550, 57 A.3d at 435; see also Cheek, 378 Md. at 159, 835

- 34 -

A.2d at 668. By contrast, if disputed, the second issue—whether a particular dispute falls within the scope of the arbitration agreement—may be decided by the court or the arbitrator, depending on the relevant circumstances. See Allstate Ins. Co. v. Stinebaugh, 374 Md. 631, 643, 824 A.2d 87, 94 (2003).[19]

### *Alleging Grounds for Revocation*

In this case, although Linton and Johnson did not specifically seek rescission of the agreements, it is readily apparent that, in the complaint, Linton and Johnson alleged "grounds that exist at law or in equity for the revocation of" the agreements in accord with CJ § 3-206(a), and thereby denied the existence of a valid arbitration agreement. See CJ § 3-207(b) ("If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists."). By its express terms, the arbitration clause states that it is effective only "[o]nce [the] transaction has closed[.]" Closure of the transaction necessarily depended on the court's approval of the transfer

---

[19]In Allstate Ins. Co., 374 Md. at 643, 824 A.2d at 94, we distilled from Gold Coast Mall "the rules for determining whether court or arbitrator determines arbitrability where the arbitrability issue is the scope of the arbitration clause and its applicability to the dispute at hand[,]" stating:

> First, in *Gold Coast Mall*, we declared that if an arbitration clause is clear, it is initially for the courts to determine whether the subject matter of a dispute falls within the scope of the arbitration clause. Second, we explained that in determining whether a dispute falls within the scope of an arbitration clause, arbitration should be compelled if the arbitration clause is broad and does not expressly and specifically exclude the dispute. Third, we concluded that if an arbitration clause is unclear as to whether the subject matter of the dispute falls within the scope of the arbitration agreement, the question of arbitrability ordinarily should be left to the arbitrator.

(Cleaned up).

under the MSSPA. In the complaint, Linton and Johnson specifically pled that the circuit court's finding that they had received independent professional advice from Smith was procured through fraud and deceit. Linton and Johnson alleged that the court would not have approved the transfer—meaning that the transaction would not have closed—had the court been aware of Smith's relationship with Access. With these allegations, Linton and Johnson disavowed the validity of both the agreements and the arbitration clause within them.

As the Court of Special Appeals explained, the circuit court and Petitioners used the term "arbitrability" to improperly conflate two separate issues that may be presented upon the filing of a motion to compel arbitration—"whether there is an agreement to arbitrate at all and [] whether a particular dispute falls within the scope of an arbitration agreement." Linton, 253 Md. App. at 521-22, 268 A.3d at 946. As stated above, and as the Court of Special Appeals recognized, whether an agreement to arbitrate exists is always a question for the court, not the arbitrator, to decide. See id. at 522, 268 A.3d at 946. Thus, despite Petitioners' contention otherwise, there is no "general rule" that an arbitrator decides issues of "arbitrability." To the contrary, our case law is clear that the circumstance in which a court plays a "leading role" in a case involving arbitration is "in deciding the arbitrability of a dispute[,]" meaning in determining the threshold issue of whether an agreement to arbitrate exists. Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, 429 Md. at 549, 57 A.3d at 434 (citation omitted). In this case, under Maryland law, the circuit court was required to determine whether a valid agreement to arbitrate existed rather than finding "that arbitrability in this case must be determined by an arbitrator and not the court" and

compelling arbitration.

Prima Paint and *Holmes*

Petitioners rely on Prima Paint and Holmes for the proposition that, where a party does not specifically challenge the validity of an arbitration clause or allege fraud in the inducement as to the arbitration clause itself, the underlying dispute is for the arbitrator to decide. If we were to accept Petitioners' argument that compelling arbitration in this case is required under the holdings of Prima Paint and Holmes because, according to them, Linton and Johnson did not specifically challenge the validity of the arbitration clause, such a determination would be inconsistent with: (1) the fact that, in the complaint, Linton and Johnson alleged that the arbitration clause itself was procured through fraud and deceit which interfered with their ability to understand the clause; (2) the provisions of the MSSPA, which require valid court approval of the transfer of structured settlement rights; and (3) the express language of the arbitration clause, which conditions arbitration on closing of the transaction.

In this case, where Linton and Johnson have alleged fraud with respect to both the agreements generally and the arbitration clause specifically, the holdings of Prima Paint and Holmes are not applicable. In Prima Paint, 388 U.S. at 396-97, the Supreme Court addressed whether a federal court or an arbitrator should resolve a claim of fraud in the inducement under a contract governed by the FAA where there was "no evidence that the contracting parties intended to withhold that issue from arbitration." In Prima Paint, Flood & Conklin ("F & C") entered into a consulting agreement with Prima Paint (which was closely followed by a contract whereby Prima Paint purchased F & C's business), pursuant

- 37 -

to which F & C was to furnish advice and consultation to Prima Paint in exchange for Prima Paint paying F & C a percentage of its receipts.  See id. at 397.  The consulting agreement included a "broad" arbitration clause, which provided in part that "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the rules then obtaining of the American Arbitration Association[.]"  Id. at 398.

A dispute arose in the performance of the consulting agreement when Prima Paint notified F & C that it believed F & C had breached the agreement by fraudulently representing that it was solvent and able to perform its contractual obligations, when in fact it was insolvent and had filed a petition for bankruptcy one week after the agreement was signed.  See id. at 398.  After F & C sought to arbitrate the dispute, Prima Paint filed in the U.S. District Court for the Southern District of New York a complaint, seeking rescission of the consulting agreement on the basis of fraudulent inducement, and a petition, seeking to enjoin F & C from proceeding with the arbitration.  See id. at 398-99.  The district court granted F & C's motion to stay the action pending arbitration, ruling that the issue of whether there was fraud in the inducement as to the agreement containing the arbitration clause was for the arbitrator and not the court.  See id. at 399.  The United States Court of Appeals for the Second Circuit dismissed Prima Paint's appeal.  See id.

In affirming the judgment of the Second Circuit, the Supreme Court explained that the agreement was governed by the FAA before turning to the operative question: "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators."  Id. at 402.  The Supreme

Court stated that the answer was in Section 4 of the FAA, which provides that

> with respect to a matter within the jurisdiction of the federal courts save for the existence of an arbitration clause, the federal court is instructed to order arbitration to proceed once it is satisfied that "the making of the agreement for arbitration or the failure to comply (with the arbitration agreement) is not in issue."

Id. at 403 (footnote omitted).  As such, the Supreme Court stated that, "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it."  Id. at 403-04 (footnote omitted).  The Supreme Court concluded, however, that Section 4 of the FAA does not allow a federal court to consider a claim of fraud in the inducement of a contract generally.  See id. at 404.

The Supreme Court held that because Prima Paint had not alleged that F & C fraudulently induced it to enter into the agreement to arbitrate in particular, arbitration should proceed.  See id. at 406-07.  In so holding, the Supreme Court stated that the language of the arbitration clause at issue, which provided that the parties would arbitrate "any controversy or claim arising out of or relating to this Agreement, or the breach thereof[,]" was "broad enough to encompass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud."  Id. at 406.

In Holmes, 336 Md. at 543-44, 649 A.2d at 369, we explained that the reasoning behind Prima Paint and its progeny is that courts treat an arbitration clause as "a severable part of the contract[,]" such that, "[w]here there are no allegations of fraud in the making of the agreement to arbitrate, the agreement to arbitrate stands apart from other allegations of infirmities in the contract."  (Cleaned up).  We explained that those cases treat an

arbitration agreement as "an independently enforceable contract[,]" meaning that a "court must determine that there are no infirmities in the formation of the arbitration agreement itself; that is, that there is a mutual exchange of promises to arbitrate." Id. at 544, 649 A.2d at 369-70. As a result, "[o]nce a court determines that the making of the agreement to arbitrate is not in dispute, its inquiry ceases, as the agreement to arbitrate has been established as a valid and enforceable contract." Id. at 544, 649 A.2d at 370. We concluded that Maryland law is consistent with this line of reasoning because our cases have long held that "an arbitration clause is a severable contract which is enforceable independently from the contract as a whole[]" and because the MUAA restricts a court's role to the narrow question of whether an arbitration agreement exists, *i.e.*, under the MUAA, "the consideration of the existence of an arbitration agreement is severable." Id. at 545-46, 649 A.2d at 370.

We concluded that, "[b]ecause Holmes ha[d] not alleged fraud in the inducement as to the arbitration clause itself or that the parties did not intend to arbitrate this type of dispute, . . . the underlying dispute is one for the arbitrator." Id. at 547, 649 A.2d at 371. We rejected the notion that, by enforcing the arbitration agreement, we were somehow "implicitly" recognizing the validity of the entire contract, and explicitly stated that, in enforcing the arbitration clause, we were recognizing "only that the arbitration clause is valid and that the merits of the dispute must be determined by an arbitrator." Id. at 547,

649 A.2d at 371.[20]

In this case, contrary to the circuit court's ruling and Petitioners' contentions, Prima Paint and Holmes do not control because in the complaint, Linton and Johnson alleged fraud and deceit as to the procurement of the agreements in general and the arbitration clause in particular, the latter allegation going directly to the making of an agreement to arbitrate—an issue that must be decided by the court, not the arbitrator. Put simply, Petitioners' contention that there was no allegation that the arbitration clause in particular was procured by fraud is incorrect. Moreover, in the complaint, Linton and Johnson clearly alleged that had they known of the fraud, they would not have entered into any aspect of the agreement at all.

In paragraph 81 of the complaint, Linton and Johnson specifically alleged:

---

[20]In Holmes, 336 Md. at 536-37, 649 A.2d at 366, Holmes signed two franchise agreements with Coverall North America, Inc., each containing an identical arbitration clause. Holmes thereafter discovered that at the time that the parties signed the first contract, Coverall had not been authorized to sell franchises in Maryland and Coverall did not obtain approval to be authorized to sell franchises until before the second contract was signed. See id. at 537-38, 649 A.2d at 366. Holmes elected not to seek rescission of the second contract and continued to perform under the contract. See id. at 538, 649 A.2d at 366. Coverall eventually advised Holmes that it was terminating the franchise agreement, and Holmes filed a complaint alleging, among other things, violations of the Maryland Franchise Act. See id. at 538, 649 A.2d at 366-67. The Court of Special Appeals affirmed the trial court's order compelling arbitration and staying the case and, in part, noted that violations of the Maryland Franchise Act made the franchise voidable as opposed to void *ab initio*. See id. at 539-40, 649 A.2d at 367-68.

We agreed with the Court of Special Appeals that, under the Maryland Franchise Act, "alleged violations of the Act would make the contract at issue merely voidable and not void *ab initio*." Holmes, 336 Md. at 547, 649 A.2d at 371. By contrast, in this case, any issue as to whether a violation of the MSSPA causes a transfer to be voidable or void *ab initio* is of no moment. A violation of the MSSPA would necessarily result in a transfer of structured settlement rights being invalid, as a transfer can be effective only if approved under the MSSPA.

> In using Defendant Charles Smith, Defendant Access Funding not only ensured that its customers would not receive true independent professional advice, but it also sought to prevent Plaintiffs from fully understanding and appreciating the Purchase agreement's provision with respect to binding arbitration and/or limiting class action rights, which were not in the Plaintiffs' best interests.

With paragraph 81, Linton and Johnson specifically alleged that by using Smith as counsel, Petitioners sought to prevent them from understanding the agreement's provision with respect to binding arbitration. A fair reading of the allegations of the complaint and paragraph 81 in particular demonstrates that Linton and Johnson alleged that, by denying them independent professional advice required by statute, Petitioners engaged in fraud to obtain their consent to the arbitration clause specifically and deprived them of the ability to understand the arbitration clause.

To be sure, Linton and Johnson did not bring a count within the complaint seeking to set aside the agreements or void the arbitration clause, but rather filed a complaint alleging negligence, negligent misrepresentation, fraud, misrepresentation, and deceit, constructive fraud, and civil conspiracy. However, as demonstrated by the complaint and paragraph 81, in particular, Linton and Johnson pled that they were prevented from understanding the arbitration clause and that the arbitration clause (and the agreements as a whole) were obtained through fraud and deceit. As such, Linton and Johnson placed in dispute the issue of whether a valid agreement to arbitrate exists—a matter squarely for the court, not the arbitrator, to decide.

Moreover, by alleging that the court's approval of the transfers was obtained by fraud and in violation of the MSSPA, Linton and Johnson necessarily alleged that the

closing of the transfers should not have occurred and that the arbitration clause was not valid. The arbitration clause in each Purchase and Sale Agreement expressly conditions the obligation to arbitrate on the closing of the transactions, providing that "[o]nce your transaction has closed," any claim or dispute "arising from or relating in any way to this Agreement . . . including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement . . . , shall be resolved by mandatory binding arbitration." The arbitration clause provides that it "cannot be used to bypass state and federal laws requiring court approval of th[e] transaction." The Purchase and Sale Agreements defined closing as occurring after entry of an order of approval of the transfer "by a court of competent jurisdiction in accordance with an applicable state transfer statute of a state of the United States of America."

Unlike the arbitration clauses at issue in <u>Prima Paint</u> and <u>Holmes</u>, which were not conditioned upon the occurrence of any event, the arbitration clause in the agreements in this case conditioned arbitration upon the happening of an express event—closing—stating that claims shall be arbitrated only "[o]nce [the] transaction has closed[.]" <u>Cf.</u> <u>Prima Paint</u>, 388 U.S. at 398 ("Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration[.]"); <u>Holmes</u>, 336 Md. at 537, 649 A.2d at 366 ("Any claim or controversy arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration[.]"). Under the express terms of the Purchase and Sale Agreements, closing occurs only following court approval of the transfer in accordance with the applicable state transfer statute, *i.e.*, the MSSPA. In short, under the plain language of the arbitration clause, the clause is not effective until the transaction has

- 43 -

closed, after court approval of the transfer. Unlike the arbitration clauses in Prima Paint and Holmes, which were severable from the contracts they were contained within, the language of the arbitration clause in this case is inconsistent with the general rule of severability because application of the arbitration clause is contingent upon approval of the transfer and closing.

In addition, as the Court of Special Appeals pointed out, the premise undergirding the holdings in Prima Paint and Holmes is that the underlying agreement and arbitration clause were the result of arm's-length transactions. See Linton, 253 Md. App. at 525, 268 A.3d at 948. An arm's-length transaction is "[a] transaction between two unrelated and unaffiliated parties" or "[a] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." *Arm's Length Transaction*, Black's Law Dictionary (11th ed. 2019). In this case, the Purchase and Sale Agreements entered into between Linton and Johnson and Access were not arm's-length transactions because Smith, the adviser to Linton and Johnson, was essentially selected and paid by Access. Smith was in fact not an independent professional advisor and Linton and Johnson were unaware of Smith's relationship with Access at the time that they entered into the agreements. Moreover, the agreements are not effective unless, by statute, a court approves the transfers upon making certain findings, including that Linton and Johnson received independent professional advice regarding the legal, tax, and financial implications of the transfer. In this case, the crux of the matter is that Linton and Johnson did not receive independent professional advice necessary for court approval of the transfers and closing of the transactions. As the Court of Special Appeals stated:

"Not only was the court's authorization required by statute for the metaphorical meeting of the minds to ripen, but the court's authorization was required, under the express terms of the arbitration clause, for the arbitration obligation to arise in the first place." Linton, 253 Md. App. at 525, 268 A.3d at 948. We agree with the Court of Special Appeals that these circumstances render the holdings in Prima Paint and Holmes inapplicable.

Quoting a case decided after Prima Paint and Holmes, not cited by Petitioners on brief in this Court, Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, 429 Md. at 550, 57 A.3d at 435, the Court of Special Appeals stated that "[c]ourts are limited to determining only one thing: whether a valid arbitration agreement exists and must be careful not to stray into the merits of any underlying agreements." Linton, 253 Md. App. at 521, 268 A.3d at 946 (cleaned up). As the Court of Special Appeals pointed out, in Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, 429 Md. at 550, 57 A.3d at 435, this Court stated that the issue of whether there is an agreement to arbitrate at all is always a question for the court, not the arbitrator, to decide. See Linton, 253 Md. App. at 521-22, 268 A.3d at 946.

In Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, 429 Md. at 537, 57 A.3d at 427, we held that "an arbitration clause may survive the expiration of a collective bargaining agreement when it concerns rights that vested during the life of the agreement[,]" and that, "when deciding the issue of arbitrability requires interpretation of the underlying agreement and consideration of the merits of the dispute, the issue of arbitrability should be initially determined by the arbitrator." In Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, id. at 540, 57 A.3d at 429, the County filed a complaint to vacate the arbitration award in the trial court, alleging among other things that "(1) the arbitrator lacked

jurisdiction and exceeded his authority because the [memorandum of understanding] containing the arbitration clause had expired, [and] (2) there was no agreement to arbitrate because the [memorandum of understanding] had expired[.]" Relying primarily on the Supreme Court's holding in Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 206 (1991), we determined:

> [A] broad arbitration clause may survive expiration of the underlying agreement when the dispute arises under the agreement. This may happen when the dispute (1) involves facts and occurrences that arose before expiration of the agreement, (2) where the rights that are the subject of the dispute accrued or vested during the life of the agreement, or (3) where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, 429 Md. at 546, 57 A.3d at 432-33.

In Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, id. at 547, 57 A.3d at 433, the second issue before the Court was who decides whether an arbitration clause survives expiration of the underlying agreement—the court or an arbitrator. We stated that, "while the validity of an arbitration agreement is an issue for the courts, which a circuit court reviews anew, the merits of the contract itself are for the arbitrator's consideration, subject only to a deferential standard of review." Id. at 553, 57 A.3d at 437 (cleaned up). We discussed the issue of an overlap between a review of the merits of an underlying agreement and a challenge to the existence of a valid arbitration agreement. See id. at 550-51, 57 A.3d at 435. In this context, we stated:

> Avoiding the merits of the dispute or the underlying agreement becomes more difficult in cases where the very arbitrability of the dispute overlaps with its merits. This may happen (1) when the parties have agreed to arbitrate, but the scope of the arbitration clause is unclear, making it necessary to interpret the entire contract; or (2) when a party challenges the

> validity of an arbitration clause based on some irregularity of the entire contract, which also requires inquiring into the merits of the dispute. These types of arbitrability challenges may involve issues arising after the formation of the arbitration agreement, such as rescission, fraud in the inducement, waiver, and termination of the contract. In those circumstances, whether the party seeking arbitration is right or wrong is a question of contract application and interpretation for the arbitrator, not the court, and the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment by attempting to resolve the ambiguity.

Id. at 550-51, 57 A.3d at 435 (cleaned up).

Unlike the potential overlap discussed in Balt. Cnty. Fraternal Ord. of Police Lodge No. 4, in this case, in paragraph 81, Linton and Johnson raise a specific challenge to the existence of the arbitration agreement based on an alleged inability to understand and enter into a valid agreement to arbitrate as a result of fraud. Any notion that there is no difference between the allegations resulting in there being a lack of a "meeting of minds" between Linton and Johnson and Access as to an agreement to arbitrate and the merits of the claims would be incorrect. In determining the issue of whether a valid agreement to arbitrate exists, the circuit court would not be required to make findings as to the merits of the claims raised in the complaint. In the renewed motions to compel arbitration, Access and Sud (and Smith) requested that the circuit court order that all claims asserted against them by Linton and Johnson in the case be submitted to binding arbitration. The issue of Linton's and Johnson's ability to understand and enter into a valid arbitration agreement would involve findings distinct from those related to the elements of the torts at issue.

In addition, under Article 8.17, the arbitration clause, arbitration depended on the closure of the transaction. Article 5.5 specifically provides that closure is conditioned upon the transaction being approved by a court in accordance with the applicable transfer statute.

- 47 -

The applicable transfer statute, the MSSPA, Md. Code Ann., Cts. & Jud. Proc. (1974, 1998 Repl. Vol., 2000 Supp.) § 5-1102(b), required that Linton and Johnson receive independent professional advice regarding the legal, tax, and financial implications of the transfer. To demonstrate a lack of compliance with the MSSPA, *i.e.*, that the transaction did not close as required under the arbitration clause, Linton and Johnson would need to show that Smith did not provide independent professional advice, *i.e.*, that Access selected and paid Smith.

By contrast, to establish fraud, negligence, and negligent misrepresentation, the primary claims pled in the complaint, Linton and Johnson must show far different things. To prevail on a claim for fraud, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. Each of these elements must be proven by clear and convincing evidence.

Gourdine v. Crews, 405 Md. 722, 758, 955 A.2d 769, 791 (2008) (cleaned up). Fraud in the inducement is one theory or means of committing fraud, see Sass v. Andrew, 152 Md. App. 406, 432, 832 A.2d 427, 261-62 (2003), and has the same elements as fraud, see Rozen v. Greenberg, 165 Md. App. 665, 674-75, 886 A.2d 924, 930 (2005), cert. denied, 391 Md. 579, 894 A.2d 546 (2006). Fraudulent inducement "means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment." Rozen, 165 Md. App. at 674, 886 A.2d at 929 (cleaned up).

To prevail on a claim of negligence, a plaintiff must establish four elements: "a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable

causal relationship between the breach of duty and the harm suffered, and damages."

Kiriakos v. Phillips, 448 Md. 440, 456, 139 A.3d 1006, 1016 (2016) (cleaned up).

Similarly, to establish a claim of negligent misrepresentation, a plaintiff must show:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
>
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
>
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
>
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
>
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Lloyd v. Gen. Motors Corp., 397 Md. 108, 135-36, 916 A.2d 257, 273 (2007) (cleaned up).

Proving or establishing the elements of negligence, negligent misrepresentation, fraud, and fraudulent inducement, including damages, which are the main aspects of Linton's and Johnson's complaint, far exceed demonstrating that Linton and Johnson lacked the ability to understand or enter into a valid agreement to arbitrate or that Smith did not provide independent professional advice as required by the MSSPA, and in turn as required by the arbitration clause, for closure of the transaction. In short, determining the existence of a valid agreement to arbitrate based on the allegations in paragraph 81 of the complaint and the language of the arbitration clause is a matter for the court, not an arbitrator.

### *Challenging the Ability to Understand the Arbitration Clause*

Like the Court of Special Appeals, we find the case of Spahr v. Secco, 330 F.3d

1266, 1273 (10th Cir. 2003) informs our analysis. See Linton, 253 Md. App. at 526-27, 268 A.3d at 949. In Spahr, 330 F.3d at 1273, the United States Court of Appeals for the Tenth Circuit concluded "that the analytical formula developed in *Prima Paint* cannot be applied with precision when a party contends that an entire contract containing an arbitration provision is unenforceable because he or she lacked the mental capacity to enter into the contract" because, unlike a claim of fraud in the inducement, "a mental capacity challenge can logically be directed only at the entire contract." (Footnote omitted). In Spahr, 330 F.3d at 1267-68, Spahr, an elderly man who suffered from "dementia and Alzheimer's disease[,]" opened an investment account with U.S. Bancorp by signing a Cash Account Agreement containing an arbitration clause. Spahr, through co-conservators of his estate, filed suit, alleging breach of fiduciary duty, fraud, constructive trust, and negligence on the ground that one of the company's stockbrokers deceived him into giving her sums of money. See id. at 1267. U.S. Bancorp filed a motion to stay the trial proceedings and compel arbitration based on the agreement signed by Spahr and subsequent agreements signed on Spahr's behalf. See id. at 1268. The district court denied the motion, concluding that the agreement to arbitrate was not enforceable due to Spahr's lack of sufficient mental capacity to understand both the nature and effect of the contract. See id.

On appeal, U.S. Bancorp argued that Spahr's mental capacity challenge should have been decided by an arbitrator, as "the parties agreed to arbitrate arbitrability" and "Spahr's mental capacity challenge goes to the validity of the entire contract, rather than merely the arbitration clause itself." Id. at 1270. The Tenth Circuit rejected both arguments and

affirmed the denial of the motion to compel arbitration.  See id. at 1270, 1275.  The Tenth

Circuit explained that Section 4 of the FAA "requires judicial resolution of issues that go

to the 'making' of an agreement for arbitration" and determined that "Spahr's claim that

he lacked the mental capacity to enter into an enforceable contract placed the 'making' of

an agreement to arbitrate at issue under § 4 of the FAA."  Id. at 1269, 1273.  The Tenth

Circuit held that Prima Paint does not apply "where a party challenges a contract on the

basis that the party lacked the mental capacity to enter into a contract."  Spahr, 330 F.3d at

1272.[21]

From our perspective, a plaintiff's alleged inability to understand the terms of an

arbitration clause in a written agreement, on the ground that the other party procured the

agreement through fraud and deceit, places the existence of a valid agreement to arbitrate

at issue and raises an issue to be decided by the court, not the arbitrator.  In this case, in the

complaint, Linton and Johnson alleged that they "suffer from cognitive deficits and other

brain impairments" and they specifically pled that Petitioners colluded to fraudulently

---

[21]In its opinion, the Tenth Circuit acknowledged that the Fifth Circuit reached a contrary result in Primerica Life Ins. Co. v. Brown, 304 F.3d 469, 472-73 (5th Cir. 2002).  See Spahr, 330 F.3d at 1272.  However, the Tenth Circuit explained that, under the holding of Prima Paint, resolution of a claim of fraud in the inducement of an entire contract is to be decided by an arbitrator, whereas resolution of a claim of fraud in the inducement of an arbitration clause itself is to be decided by the court, as that claim goes to the making of an agreement to arbitrate under Section 4 of the FAA.  See Spahr, 330 F.3d at 1272-73.  According to the Tenth Circuit, this rule is easy to apply because, when "a party challenges a contract on the basis that it was induced by fraud[,] it is conceivable either that (1) [the party] was fraudulently induced to agree to a contract containing an arbitration agreement; or (2) [the party] was fraudulently induced to agree to the arbitration provision in particular."  Id. at 1273.  The Tenth Circuit stated, though, that the same cannot be said where "a party raises a mental capacity challenge, as it would be odd indeed if a party claimed that its mental incapacity specifically affected the agreement to arbitrate."  Id.

interfere with their ability to obtain independent professional advice and sought to prevent

them from fully understanding and appreciating the agreement's provision with respect to

binding arbitration. Such allegations clearly go to the issue of the making of a valid

agreement to arbitrate.[22]

### *Election of Remedies and Collateral Attack Contentions*

We are not persuaded by Petitioners' contention that Linton and Johnson affirmed

the Purchase and Sale Agreements by suing for fraud and negligence and not rescission,

and thus are bound by the terms of the arbitration clause in the agreements. Nor are we

persuaded by Petitioners' contention that Linton and Johnson "have not sought to have the

arbitration agreements or their Agreements as a whole declared void, because to do so

would be to impermissibly attack the enrolled judgments approving the transfers of their

---

[22]We are aware that the language of the arbitration clause at issue provides that once the transaction has closed, any claim or dispute "arising from or relating in any way to this Agreement . . . including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement . . . shall be resolved by mandatory binding arbitration." Assuming the transaction had closed in accordance with the MSSPA as required under Article 5.5 of the agreements (which it did not), the arbitration clause contemplates that arbitration is required for any claims concerning the applicability of the clause, a fair interpretation of which would mean the scope of the arbitration clause and whether a particular dispute falls within the scope. The arbitration clause does not provide that a claim concerning the validity or existence of the arbitration clause itself is subject to mandatory binding arbitration. This is for good reason, as such a provision would be contrary to the MUAA and our case law.

To the extent that the language of the arbitration clause could be read to mean as such, the clause is ambiguous, and we would construe the language against Access as the party that drafted the language. See, e.g., Impac Mortg. Holdings, Inc. v. Timm, 474 Md. 495, 508, 255 A.3d 89, 97 (2021) (One rule of contract "interpretation is that ambiguous language in a contract that is not clarified by extrinsic evidence or interpretive aids is construed against a party to the contract when that party drafted the language in question[.]").

structured settlement rights pursuant to the Agreements."[23]   As to the contention

concerning election of remedies and "affirmation" of the Purchase and Sale Agreements,

Petitioners are generally correct that, under Maryland law, when a party to a contract

discovers that the contract has been procured by fraud, the party may elect to rescind the

contract or to ratify it and claim damages, and that ratification of the contract precludes

seeking rescission of the contract.  See, e.g., Sonnenberg v. Security Mgmt. Corp., 325 Md.

---

[23]We note that Petitioners raised these arguments in the circuit court at the hearing on the motion to compel arbitration.  At the hearing, counsel for Petitioners argued, among other things:

> The second point I will make, Your Honor, is if you look at their complaint, they are not even seeking rescission of the contract.  They're not seeking avoidance.  So when you look at Section 2 of 9 U.S.C. on the Federal Arbitration Act and where the courts or deals -- when you're dealing with fraud in the inducement where you -- of the arbitration you're seeking to res[ci]nd, annul, void that provision, and you will get their complaint.  They have affirmed these agreements, and they're seeking damages.  As we all know, the Plaintiff has an election of remedies when there's a fraud.  They can seek rescission, or they can seek damages.  Can't do both because when you go down the road of forming the contract and seeking damages, you've affirmed the contract.  So that's what they did here in their complaint.  If you look at their damages provision, they're seeking damages.  Their position is because of all of this fraud, alleged fraud, that their clients didn't get the value that they should have gotten on the transfers.  They don't think they rescinded, and why they don't seek to rescind these things is because they can't, and they know it because these things are -- these are -- these judgments are final and binding on them.  And that was the position they have taken in this case as we went up on appeal to the Court of Appeals, you can't collaterally attack the judgements that affirm these transfers.  So these agreements are binding and enforceable, they're not attacking them, they're seeking damages.  So they're not seeking even to annul or void the contract, much less are they seeking to annul or void the arbitration provision.

In compelling arbitration, the circuit court did not address Petitioners' arguments as to election of remedies and collateral attack on enrolled judgments.  As such, in its opinion, the Court of Special Appeals did not address the matters.

117, 124-25, 599 A.2d 820, 823-24 (1992); Sommers v. Dukes, 208 Md. 386, 393, 118 A.2d 660, 663 (1955); Doe Mountain Enters., Inc. v. Jaffe, 171 Md. App. 1, 17, 908 A.2d 644, 653 (2006), cert. denied, 396 Md. 525, 914 A.2d 769 (2007); Merritt v. Craig, 130 Md. App. 350, 358, 746 A.2d 923, 927, cert. denied, 359 Md. 29, 753 A.2d 2 (2000). In Sonnenberg, 325 Md. at 119, 599 A.2d at 821, we addressed "whether a deceit action will lie where the plaintiffs, who allegedly were fraudulently induced to contract to purchase realty, closed on the[] transactions after discovery of the fraud." In resolving a dispute between the parties as to the effect of the plaintiffs closing on the purchase of homes after having knowledge of potential grounds for litigation, we outlined the two general approaches as follows:

> A rule which is very widely if not universally accepted runs to the effect that where a contract has been procured by fraud the defrauded party on discovery of the fraud is presented with a choice of rights and remedies in that he may either (1) rescind, or (2) 'affirm' and recover damages. The rule, however, as will be observed, is not specific as to whether or not it applies to situations in which the contract was still in part, or wholly, unexecuted when the fraud was discovered.

> The great majority of the cases support the rule that where the defrauded party has in part, or at least in substantial part, performed the contract at the time of discovering the fraud, he may go on with performance and also recover or have the appropriate allowance of damages. And the decisions are very strongly to the effect that there is no waiver by the mere going on with the contract if, when the fraud was discovered, a stopping or abandonment of performance was not reasonably practicable, or, to express a similar idea, if the defrauded party was then in a situation from which he was unable to recede without prejudice.

> On the other hand, a minority of cases, with more or less distinctness, and with some incidental variations in doctrine, may be regarded as supporting a general rule to the effect that the choice presented to the defrauded party is to rescind or to take the contract as it is without reservation, and that he cannot proceed under it and have damages if when the fraud was discovered

- 54 -

the contract had been executed in part only, and most especially if little or nearly nothing had been done in performance, or if knowledge of the fraud was obtained in season to permit him to recede—but whether the latter specification means in season to recede without any loss or injury at all, or without serious or substantial injury is a matter of some uncertainty.

Id. at 123-24, 599 A.2d at 823 (cleaned up). We explained that "Maryland law is in accord with the majority position described above[,]" *i.e.*, "[p]ersons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the contract or to ratify the contract and seek damages, either affirmatively or by recoupment." Id. at 124, 599 A.2d at 823. However, we made clear that, "where the allegedly defrauded party has affirmed the contract by conduct and then sued for damages, our cases have permitted a deceit action even though the fraud was discovered while the contract was executory[,]" and discussed numerous cases holding as much. Id. at 125, 599 A.2d at 824.[24]

First, the principles discussed above and applied in Sonnenberg and other cases do not stand for the proposition that a decision to seek damages rather than rescission of a contract supersedes the MUAA and our case law holding that whether a valid arbitration agreement in a contract exists is an issue that must be decided by the court rather than an arbitrator. Nor do Petitioners cite to any authority to support such a proposition. In other

---

[24]By contrast, in Doe Mountain, 171 Md. App. at 18, 908 A.2d at 654, the Court of Special Appeals concluded that Doe Mountain could not sue for damages like the plaintiffs in Sonnenberg because Doe Mountain knew of the alleged fraud before contracting, as opposed to discovering the fraud while the contract was executory. The Court of Special Appeals explained that the doctrine of ratification discussed in Sonnenberg did "not support Doe Mountain's claim that it could sign the [a]greement with knowledge of the alleged fraud and thereafter sue for damages." Doe Mountain, 171 Md. App. at 18, 908 A.2d at 654.

words, that a party may have sought damages under a contract on allegations of fraud and deceit and alleged having been prevented from understanding the meaning of an arbitration clause, rather than specifically seeking rescission of the contract, would not negate the application of the MUAA and case law directing that the court, not an arbitrator, determines whether an agreement to arbitrate exists where the issue is raised.

In addition, the facts of <u>Sonnenberg</u> and <u>Doe Mountain</u>, two cases cited by Petitioners, involve parties who discovered fraud either before contracting or during the executory period and who elected to perform, thus ratifying the contracts with knowledge of the fraud. There is no allegation here that Linton and Johnson were aware of any alleged fraud at any point before the transfers were approved. Indeed, the complaint shows that Linton and Johnson have alleged that they were not aware of any fraud during the process of transferring their structured settlement payment rights. Moreover, Linton and Johnson alleged that the arbitration clause is unenforceable because it was procured by way of the fraud for which damages are sought.

Similarly, Petitioners' contentions concerning the collateral attack doctrine are flawed for two main reasons. First, the doctrine is not applicable under the circumstances of this case because approval of the transfer did not involve entry of judgment. Second, a judgment procured by extrinsic fraud that deprives a court of fundamental jurisdiction to enter the judgment is subject to collateral attack. Initially, Petitioners misapprehend the nature of the courts' orders authorizing the transfer of structured settlement rights and mischaracterize the orders as enrolled judgments. Petitioners appear to mistakenly believe that the agreements have somehow been incorporated into an enrolled judgment because

the transfers were approved by the circuit court.

Contrary to Petitioners' assertion, the Court of Special Appeals's opinion remanding "th[e] case to the Circuit Court to determine whether there was valid court authorization for the closing of the transaction to take place" did not "invite[] the Circuit Court to countenance a collateral attack on the enrolled judgments approving the transfers subject to the Agreements[.]" (Cleaned up). In actuality, the Court of Special Appeals stated that Linton and Johnson "have alleged grounds at law or in equity to rescind these contracts[,]" *i.e.*, "have denied the existence of a valid arbitration agreement"; therefore, it directed the circuit court to determine the threshold question of whether an arbitration agreement exists. Linton, 253 Md. App. at 525-26, 268 A.3d at 948. Despite Petitioners' attempts to do so, the Court of Special Appeals's opinion cannot be interpreted as authorizing a collateral attack on an enrolled judgment.

When a court issues an order authorizing a transfer of structured settlement payment rights under the MSSPA, the underlying agreement is not incorporated into an enrolled judgment nor, for that matter, is the court's order approving the transfer. Under the MSSPA, a court may, after making certain required findings, "authorize[]" in a court order the transfer of structured settlement payment rights. CJ §§ 5-1102(b), 5-1103(b). Although a copy of the transfer agreement must be included when the transferee files with the court a petition for authorization of a proposed transfer, in issuing an order authorizing the transfer, the transfer agreement is not incorporated or made a part of the order. The MSSPA narrowly defines the court's role as deciding, based on identified factors, whether to authorize a proposed transfer. The agreement memorializing the transfer is between the

- 57 -

parties. In this case, the circumstance is that the agreement contains an arbitration clause which specifically states that arbitration is dependent upon the transaction closing and Linton and Johnson have challenged the validity of the clause.

To be sure, there are occasions when a Maryland court can confer judicial authority on the terms of an agreement negotiated by parties. For example, "[a] consent judgment or consent order is an agreement of the parties with respect to the resolution of the issues in the case or in a settlement of the case, that has been embodied in a court order and entered by the court, thus evidencing its acceptance by the court." Long v. State, 371 Md. 72, 82, 807 A.2d 1, 6 (2002) (cleaned up). We have explained:

> [A] consent decree [] embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.

Id. at 82-83, 807 A.2d at 7 (cleaned up). By contrast, in this case, although by statute the transfer of structured settlement payment rights must be authorized in a court order, the statute does not contemplate the entry of judgment.[25]

---

[25]Maryland Rule 1-202(o) defines a "judgment" as "any order of court final in its nature entered pursuant to these rules." Under Maryland Rule 2-601(a)(4), a final judgment becomes effective once it is set forth on a "separate document," as required by Maryland Rule 2-601(a)(1), and is entered in accordance with Maryland Rule 2-601(b). Maryland Rule 2-601(a) provides, in pertinent part, that "[e]ach judgment shall be set forth on a separate document and should include a statement of an allowance of costs as determined in conformance with Rule 2-603[,]" Md. R. 2-601(a)(1), and that "[a] judgment is effective only when so set forth and when entered as provided in section (b) of this Rule[,]" Md. R. 2-601(a)(4). At the time that the circuit court approved the transfers in this case, Maryland Rule 2-601(b) provided that "[t]he clerk shall enter a judgment by making a record of it in writing on the file jacket, or on a docket within the file, or in a docket book, according to the practice of each court, and shall record the actual date of the

Regardless, it is well settled that a judgment procured by "extrinsic" fraud is subject to collateral attack. In <u>Schwartz v. Merchants Mortg. Co.</u>, 272 Md. 305, 308, 322 A.2d 544, 546 (1974), we explained that the longstanding principle in Maryland, "unequivocally and specifically adopted as the law of this State[,]" and "thereby settled beyond question[,]" is "that an enrolled decree will not be vacated even though obtained by the use of forged documents, perjured testimony, or any other frauds which are 'intrinsic' to the trial of the case itself." We explained that this rule serves the

> principle that, once parties have had the opportunity to present before a court a matter for investigation and determination, and once the decision has been rendered and the litigants, if they so choose, have exhausted every means of reviewing it, the public policy of this State demands that there be an end to that litigation.

<u>Id.</u> at 308, 322 A.2d at 546. However, the rule favoring finality can be outweighed upon "a showing that the jurisdiction of the court has been imposed upon, or that the prevailing party, by some extrinsic or collateral fraud, has prevented a fair submission of the controversy." <u>Id.</u> at 308-09, 322 A.2d at 546 (cleaned up).

To illustrate this type of extrinsic fraud, we turned to examples provided by the Supreme Court in <u>United States v. Throckmorton</u>, 98 U.S. 61, 65 (1878):

> Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney

---

entry. The date shall be the date of the judgment." <u>Lee v. Lee</u>, 466 Md. 601, 622, 223 A.3d 478, 490 (2020) (cleaned up). In this case, it is clear that, although the court issued written orders approving the transfers, the orders did not constitute judgments incorporating the agreements between the parties.

regularly employed corruptly sells out his client's interest to the other side,[
] these, and similar cases which show that there has never been a real contest
in the trial or hearing of the case, are reasons for which a new suit may be
sustained to set aside and annul the former judgment or decree, and open the
case for a new and a fair hearing.

Schwartz, 272 Md. at 309, 322 A.2d at 547. We explained that "fraud is extrinsic when it

actually prevents an adversarial trial, but is intrinsic when it is employed during the course

of the hearing which provides the forum for the truth to appear, albeit that truth was

distorted by the complained of fraud." Id. at 309, 322 A.2d at 547. In other words, case

law demonstrates that a judgment procured by extrinsic fraud is one that deprives a court

of fundamental jurisdiction and thus is void and can be collaterally attacked. See LVNV

Funding LLC v. Finch, 463 Md. 586, 608-09, 207 A.3d 202, 215 (2019).

In this case, in the complaint, Linton and Johnson alleged that Petitioners engaged

in fraud to obtain court orders authorizing the transfer of their structured settlement

payment rights by using Smith to ensure that they did not receive independent professional

advice as required under the MSSPA. The type of collusion which Petitioners were alleged

to have engaged in is a classic example of extrinsic fraud—easily fitting within what is

described as preventing "a fair submission of the controversy" to the court. Schwartz, 272

Md. at 309, 322 A.2d at 547 (cleaned up). All of this is to say that even if their contentions

constituted a collateral attack on an enrolled judgment (which they do not), Linton and

Johnson have asserted extrinsic fraud and the alleged attack would be a permissible one.[26]

---

[26]As in the Court of Special Appeals, the parties do not raise in this Court an issue
as to the other two aspects of the circuit court's ruling in granting the motions to compel
arbitration—(1) that all Petitioners, even those not parties to the Purchase and Sale

*Conclusion*

For all of the reasons discussed herein, we conclude that Linton and Johnson sufficiently challenged the validity of the arbitration clauses by alleging that the entire agreement, including the arbitration clause, was achieved through fraud upon them and the courts approving the transfers, and by specifically alleging that Petitioners fraudulently schemed to prevent them from understanding the meaning of the arbitration provision. In short, Linton and Johnson have denied the existence of a valid agreement to arbitrate, meaning that, under Maryland case law and CJ § 3-207(b) of the MUAA, the court, not the arbitrator, must decide the question of whether an arbitration agreement exists. Like the Court of Special Appeals, we refrain from expressing any view as to how the circuit court should decide the merits of the question. See Linton, 253 Md. App. at 526, 268 A.3d at 949. Pursuant to CJ § 3-207(c), the merits of the question are for the circuit court to decide. What is plain, though, is that because Linton and Johnson denied the existence of a valid arbitration agreement, the circuit court erred in compelling arbitration of the matter.

Finally, just as the Court of Special Appeals did, we conclude that compelling arbitration in this case would effectively permit Petitioners "to circumvent the court authorization process mandated by the [Maryland] Structured Settlement Protection Act." Linton, 253 Md. App. at 527, 268 A.3d at 949. To permit an arbitrator to decide a dispute concerning the existence of an agreement to arbitrate where the plaintiffs allege that they

---

Agreements, *i.e.*, Smith, had standing to invoke the arbitration clause and (2) that Petitioners had not waived the right to enforce the arbitration clause. See Linton, 253 Md. App. at 517, 268 A.3d at 943.

agreed to the transfer of their structured settlement payment rights without independent professional advice and the court's authorization of the transfer was obtained by fraud "would be the same as allowing Access to avoid the court at the very stage in the process where the General Assembly required the court's approval." Linton, 253 Md. App. at 527, 268 A.3d at 949 (citation omitted). The arbitration clause in the Purchase and Sale Agreements expressly provides that the clause is not to be used for such a purpose, stating: "This arbitration provision cannot be used to bypass state and federal laws requiring court approval of this transaction."

In sum, we affirm the judgment of the Court of Special Appeals remanding the case to the circuit court for further proceedings. We conclude that the circuit court erred in compelling arbitration and that the issue of whether a valid arbitration agreement exists is an issue for the court to determine.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONERS TO PAY COSTS.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 5

September Term, 2022

_____

ACCESS FUNDING, LLC, ET AL.

v.

CHRYSTAL LINTON, ET AL.

_____

Watts,
Hotten,
Booth,
Gould,
Eaves,
Adkins, Sally D. (Senior Judge,
     Specially Assigned),
McDonald, Robert N. (Senior Judge,
     Specially Assigned),


JJ.
_____

Dissenting Opinion by Gould, J.
_____

Filed: December 1, 2022

I respectfully dissent.[1]

An agreement to arbitrate a future dispute is enforceable "except upon grounds that exist at law or in equity for the revocation of a contract."  Md. Code Ann. (2006, 2020 Repl. Vol.), Courts and Judicial Proceedings ("CJP") § 3-206(a).  One basis for disputing the existence of an arbitration agreement is fraudulent inducement.  When a party disputes the existence of an arbitration agreement, the court's role is, as the majority notes, limited to determining whether an arbitration agreement covering the dispute exists.  *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 588 (2006).  The circuit court is required to make this determination "expeditiously."  CJP § 3-207(b).

"The Maryland Uniform Arbitration Act provides that, in adjudicating a petition for an order of arbitration or a stay pending arbitration, the consideration of the existence of

---

[1] For ease of reference, I will start with some defined terms:

"Purchase Agreement" - Dimeca Johnson entered into a Purchase and Sale Agreement with an entity called Assoc., LLC, and Crystal Linton entered into a virtually identical Purchase and Sale Agreement with an affiliated entity called Access Funding, LLC.  Thus, the Purchase and Sale Agreements used in plaintiffs' transactions will be referred to in the singular as "Purchase Agreement."

"Annuitant" - As recipients of annuity payments pursuant to their respective structured settlement agreements, plaintiffs may be referred to as an "annuitant."

"Purchaser" - Although plaintiffs sued other affiliated entities and individuals, the only issue before this Court is the validity and enforceability of the identical arbitration clause in the Purchase Agreement.  Thus, the purchasing entity under the Purchase Agreement will sometimes be referred to in the singular as "Purchaser."

"Assigned Payments" - Borrowing the definition used in the Purchase Agreement, and keeping in mind that an annuitant may assign some or all future payments, the term "Assigned Payments" will refer to the specific future annuity payments sold by plaintiffs pursuant to their respective Purchase Agreements.

an arbitration agreement is severable" from the underlying contract. *Holmes v. Coverall North America, Inc.*, 336 Md. 534, 546 (1994); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967). Thus, to avoid enforcement of an arbitration agreement, the allegations of fraud must go specifically and exclusively to that arbitration agreement, not to the merits of the underlying dispute. *Baltimore Cnty. Fraternal Order of Police Lodge No. 4 v. Baltimore Cnty.*, 429 Md. 533, 552 (2012) (citing *Holmes*, 336 Md. at 541-47). In "recognition of the legislative intent to favor arbitration," this is supposed to be a narrow inquiry. *Holmes*, 336 Md. at 546.

As explained by Judge Adkins, speaking for this Court in *Baltimore County, Fraternal Order of Police Lodge No. 4 v. Baltimore County*:

> Avoiding the merits of the dispute or the underlying agreement becomes more difficult in cases where the very arbitrability of the dispute overlaps with its merits. This may happen (1) when the parties have agreed to arbitrate, but the scope of the arbitration clause is unclear, making it necessary to interpret the entire contract, . . . or (2) when a party challenges the validity of an arbitration clause based on some irregularity of the entire contract, which also requires inquiring into the merits of the dispute . . . . These types of arbitrability challenges may involve "issues arising after the formation of the arbitration agreement, . . . such as rescission, fraud in the inducement, waiver, and termination of the contract." . . . In those circumstances, "[w]hether the party seeking arbitration is right or wrong is a question of contract application and interpretation for the arbitrator, not the court, . . . and the court should not deprive the party seeking arbitration of the arbitrator's skilled judgment by attempting to resolve the ambiguity[.]"

429 Md. at 550-51 (internal citations omitted).

Thus:

> [i]f one could decide that [the plaintiff's] grievance was arbitrable without interpreting the underlying [contract] or addressing the merits of [the plaintiff's] claims, the arbitrability issue in this case was an issue for the court

2

to decide initially. But if the arbitrability issue cannot be so decided, it was within the arbitrator's purview.

*Id.* at 553.

Plaintiffs' complaint alleges separate counts of negligence, negligent misrepresentation, and fraud. Each of these counts rest on the same operative facts: (1) Purchaser chose and paid Charles Smith to serve as plaintiffs' statutorily mandated independent professional adviser; (2) by holding Mr. Smith out as independent, and by failing to disclose his close ties with Purchaser and its executives, defendants conspired to fraudulently induce plaintiffs to sell their future payments pursuant to the Purchase Agreement and defrauded the courts in securing their approval of the transactions; and (3) plaintiffs relied on Mr. Smith to be independent and, had they known otherwise, they would not have entered into the Purchase Agreement.

The majority's analysis relies heavily on the fact that in paragraph 81 of the complaint, plaintiffs specifically identified the arbitration agreement as a product of the alleged conspiracy to defraud. Paragraph 81 states:

> In using Defendant Charles Smith, Defendant Access Funding ***not only ensured that its customers would not receive true independent professional advice***, but it also sought to prevent Plaintiffs from fully understanding and appreciating the Purchase agreement's provision with respect to binding arbitration and/or limiting class action rights, which were not in the Plaintiffs' best interests.

(Emphasis added).

From this allegation, the majority concludes that plaintiffs satisfied *Prima Paint* and *Holmes*. But that misses the point of those cases. The essential teaching of *Holmes* is that the arbitration agreement must be enforced if the fraud challenge to its existence "go[es]

3

to the validity of the contract as a whole." 336 Md. at 546. Thus, it's not enough to simply allege the magic words that the arbitration agreement was induced by fraud.

Paragraph 81 cannot be read in isolation. In the first 80 paragraphs of the complaint, plaintiffs allege the conspiracy to deprive them of independent professional advice that allegedly defrauded them into agreeing to the Purchase Agreement. Fairly construed, paragraph 81 merely states that the consequences of that conspiracy did not stop with the deprivation of independent professional advice as to the Purchase Agreement; it also deprived plaintiffs of the advice they needed to understand the Purchase Agreement's arbitration and class action waiver provisions.

Similarly, in their memorandum in opposition to defendants' petitions to compel arbitration, plaintiffs drove home that same point: that both consequences—agreeing to the Purchase Agreement and agreeing to the arbitration clause—resulted from the same core facts. Discussing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, plaintiffs stated:

> The making of the Arbitration Agreement, among other complaints, is exactly what is "in issue" in this case. The Smith Defendants were to provide legal advice, including on the Arbitration Agreement contained within the Purchase Agreement. Mr. Smith's advice *was* the fraudulent inducement. The major aspect of the conspiracy to commit fraud was lack of independence of counsel with respect to the construction of the Purchase Agreement and the substance of the sub-agreements therein. This is the gestalt of the Plaintiffs' complaint: the conspiracy to defraud found in the making of the agreement.

The salient question here is whether the fraud as to the arbitration clause is predicated on the same operative facts as plaintiffs' claim of fraud as to the entire Purchase Agreement. On this critical issue, plaintiffs gave it away in their opposition when they acknowledged that "[t]he major aspect of the conspiracy to commit fraud was lack of

4

independence of counsel with respect to the construction of the Purchase Agreement and the substance of the sub-agreements therein." The sub-agreement to which plaintiffs referred, of course, was the arbitration agreement. Accordingly, it would have been impossible for the circuit court to have adjudicated the fraudulent inducement claim as to the arbitration clause without also adjudicating plaintiffs' fraud count and making factual findings on the same issues that underpin the other counts of the complaint.[2] The circuit court got it right when it held that the arbitration clause was valid and enforceable.[3]

The majority departs from settled law requiring arbitration agreements to be viewed as separate from the underlying contract by contending that "the language of the arbitration clause in this case is inconsistent with the general rule of severability because application

---

[2] The majority distinguishes this case from *Baltimore County* by suggesting that the plaintiffs' fraudulent inducement theory boils down to plaintiffs' "ability to understand and enter into a valid arbitration agreement" and would therefore "involve findings distinct from those related to the elements of the torts at issue." Maj. slip op. at 47. This is clearly wrong. Proof that plaintiffs lacked the ability to understand and enter into the arbitration agreement will not establish each element of the torts at issue. The core findings necessary to adjudicate the validity of the arbitration agreement and the tort counts are not distinguishable in any material way.

[3] By focusing on the complaint, the majority overlooks the procedural posture of the matter at the time the circuit court made its ruling. The issue of the existence of the arbitration agreement was before the court pursuant to Maryland Rule 2-311, which governs motions practice in circuit court civil actions. Under that rule, the parties making and responding to the motion "shall state with particularity the grounds and authorities in support" of their respective positions. Md. Rule 2-311(c). The parties are also required to provide the court with the evidentiary support of their positions, including exhibits and affidavits. Md. Rule 2-311(c), (d). The only evidence put before the court was the Purchase Agreement containing the arbitration clause. Plaintiffs neglected to provide any evidence to support their fraudulent inducement theory. Consistent with the public policy favoring arbitration and the circuit court's statutory duty to "expeditiously" decide disputes over the existence of an arbitration agreement, CJP § 3-207(b), the circuit court would have been within its discretion to grant defendants' motion on that basis alone.

of the arbitration clause is contingent upon approval of the transfer and closing." Maj. slip op. at 44. But it's only inconsistent if one chooses to view it that way; our caselaw requires that the benefit of any doubt be resolved in favor of enforcing arbitration agreements. *Holmes*, 336 Md. at 545. So, if there is a reasonable way to construe the arbitration clause as severable from the Purchase Agreement, our precedent tells us to do so. And there is.

Court approval and the subsequent closing are more reasonably understood as defining the scope of the arbitration clause, not as conditions precedent to its existence. Parties to an arbitration agreement have the latitude to define the scope of the duty to arbitrate as broadly or narrowly as they see fit. The scope can, if the parties so choose, be defined by reference to the types of claims that are included or excluded. For example, some parties may broadly define the scope as "any and all claims of any nature whatsoever arising out of their relationship." Other arbitration clauses may limit their scope to certain types of claims and exclude others. Here, the parties merely defined the scope of the arbitration clause by limiting it to post-closing disputes.

Plaintiffs' transactions did, in fact, close, so this dispute is clearly within the scope of the arbitration clause. Similarly, the condition precedent to closing—court approval— was satisfied in each case. Nothing that plaintiffs hope to accomplish in this litigation can change those facts. This is as it should be, as annuity issuers rely on court orders directing them to pay the assignee instead of the annuitant. If a court order is unwound, it would mean that, in retrospect, the annuity issuer paid the wrong person. The orders approving

6

the transactions will not be rendered void if plaintiffs prevail. *See LVNV Funding LLC v. Finch*, 463 Md. 586, 611 (2019).[4]

The majority's analysis confuses the *existence* of the arbitration agreement with its *applicability* to the underlying dispute. In fact, these are distinct concepts. The existence of an arbitration agreement is "a matter of contract." *Walther v. Sovereign Bank*, 386 Md. 412, 425 (2005) (quoting *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139, 147 (2003)). "A contract is formed when an unrevoked offer made by one person is accepted by another." *Prince George's Cnty. v. Silverman*, 58 Md. App. 41, 57 (1984). We stated in *Holmes* that:

> [t]he court must determine that there are no infirmities in the formation of the arbitration agreement itself; that is, *that there is a mutual exchange of promises to arbitrate*. Once a court determines that the making of the agreement to arbitrate is not in dispute, its inquiry ceases, as the agreement to arbitrate has been established as a valid and enforceable contract.

336 Md. at 544 (emphasis added).

Here, there is no difficulty ascertaining when the "mutual exchange of promises to arbitrate" occurred. The first page of the Purchase Agreement contains a "summary of transaction" that includes the "date of the agreement," which was the date when the

---

[4] In footnote 25, the majority seems to be suggesting that the court orders approving the transactions were not final orders. If so, this is incorrect. Such orders satisfy the definition of judgment, which is "any order of court final in its nature entered pursuant to these rules." Md. Rule 1-202(o). Clearly, the orders approving the transfers are "orders," and clearly they are "final in nature," because nothing further was required to be done to conclude the matter. In addition, the orders were set forth and entered as separate documents, as required by Rule 2-601(b). Any parties aggrieved by those orders could have taken an appeal to the Court of Special Appeals. To be clear, however, I agree with the majority that the orders approving the transfers did *not* incorporate the Purchase Agreement, which seems to be the point of footnote 25.

7

annuitant signed it. Thus, the mutual exchange of promises to arbitrate post-closing disputes occurred *before* Purchaser petitioned the court for approval. Court approval of the transactions, therefore, was not a condition precedent to the *existence* of the arbitration agreement. Under *Holmes*, our inquiry should end there.[5] *See id.*

The majority's focus on the court approval required is misguided for additional reasons. *First*, by its nature, a fraudulent inducement claim rests on facts that occurred *before* the agreement was formed. "The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307 (1975)). A plaintiff must prove: (1) defendant made a false representation of a material fact or, owing a duty of disclosure, failed to disclose a material fact; (2) defendant was aware the representation was false; (3) defendant made the misrepresentation with the intent to defraud the plaintiff; (4) plaintiff reasonably relied on the misrepresentation; and (5) plaintiff was injured as a result of the misrepresentation. *Gourdine v. Crews*, 405 Md. 722, 758 (2008). All of this must have occurred *before* the parties reached their executory agreement to arbitrate post-closing disputes. Here, the alleged fraud on the court to secure court approval came *after* the Purchase Agreement was signed and therefore *after* the agreement to arbitrate was

---

[5] In any event, even if performance of a contractual duty (here, the duty to submit certain future disputes to arbitration) is conditioned on the happening of a future event (here, closing), "the contract is no less binding than one made without a condition." *Chernick v. Chernick*, 327 Md. 470, 479 (1992) (holding that parties made a binding contract to modify divorce decree even though the agreement was subject to court approval).

formed. Whether the court approved the transactions is not relevant to the elements of fraud.

Indeed, unless plaintiffs can show that *they* were deceived by the misrepresentations about Mr. Smith's independence, that the court may have been deceived by the same misrepresentations is irrelevant to the existence of the arbitration agreements. To illustrate the point, suppose Mr. Smith met with the annuitants, disclosed his relationship with Purchaser, advised the annuitants that they were getting an unfair deal, but the annuitants decided to sign the Purchase Agreement anyway. And suppose that to get the transactions approved, Purchaser misrepresented to the courts that Mr. Smith was independent. Under that scenario, even though the courts were defrauded into issuing the orders, plaintiffs could not claim that they were fraudulently induced into entering into either the Purchase Agreement or the arbitration clause.

In distancing its opinion from the teachings of *Prima Paint* and *Holmes*, the majority likens this case to *Spahr v. Secco*, 330 F.3d 1266, 1273 (10th Cir. 2003). In *Spahr*, for purposes of applying *Prima Paint*, the Tenth Circuit distinguished allegations of fraudulent inducement from allegations of lack of mental capacity to contract. In doing so, the Court observed that when "a party challenges a contract on the basis that it was induced by fraud[,] it is conceivable either that (1) [the party] was fraudulently induced to agree to a contract containing an arbitration agreement; or (2) [the party] was fraudulently induced to agree to the arbitration provision in particular." *Id.* at 1273. Not so with a mental capacity challenge, the Tenth Circuit held, as a lack of capacity to enter the underlying contract would simultaneously deprive the party of the mental capacity to agree to arbitrate. *Id.*

9

I agree that a mental capacity challenge is different than a fraudulent inducement challenge and that the Tenth Circuit's distinction makes sense. But that distinction does not apply here because plaintiffs did not assert a lack of mental capacity in their response to defendants' motion to compel arbitration. Instead, they limited their challenge to a claim of fraudulent inducement. As stated above (*see* footnote 3), under Rule 2-311, the circuit court had the right to cabin its analysis to the theories advanced in plaintiffs' written opposition to the motions. Consistent with the judiciary's duty to expedite resolutions of disputes over the existence of an arbitration agreement, our analysis should be similarly constrained. *See also* Rule 8-131.

The majority distinguishes *Prima Paint* and *Holmes* for yet another reason—that both cases dealt with arms-length contracts, whereas the Purchase Agreement was not arms-length. In that regard, the majority contends that the Purchase Agreement was not "effective" until court approval.

I disagree. Neither *Prima Paint* nor *Holmes* purports to confine their analyses to so-called "arms-length" agreements. And, as explained above, the Purchase Agreement and agreement to arbitrate post-closing disputes came into existence when the Purchase Agreement was fully executed. Put another way, as explained above, the meeting of the minds on the arbitration agreement took place *before* the court approved the transactions.

10

Moreover, the Purchase Agreement imposed duties on the parties even before they secured court approval.[6]

Further, court approval was not required under the Maryland Structured Settlement Protection Act ("the MSSPA") for the Purchase Agreement to be "effective." Specifically, pursuant to CJP § 5-1102(b) (2013 Repl. Vol.), to approve an assignment, the court was required to find that:

(1) The transfer is necessary, reasonable, or appropriate;

(2) The transfer is not expected to subject the payee, the payee's dependents, or both, to undue or unreasonable financial hardship in the future;

(3) The payee received independent professional advice regarding the legal, tax, and financial implications of the transfer; and

(4) The transferee disclosed to the payee the discounted present value.

Under its plain terms, this statute required approval of the assignment of the payments and the economic terms of the transactions, not the Purchase Agreement itself. A contrary holding would effectively re-write the statute to impose a duty on the court to review and approve every provision of the Purchase Agreement. More importantly, it would incorrectly have put the court's imprimatur on contract clauses that redound only to

---

[6] Two examples illustrate this point. *First*, under section 3.5 of the Purchase Agreement, the annuitant agreed to provide Purchaser with copies of certain documents before court approval. *Second*, in various sections of the Purchase Agreement, the annuitant made certain representations to Purchaser, and under section 4.4, the annuitant had a duty pre-closing to "immediately notify the Purchaser if any of the representations or warranties" were incorrect or misleading.

11

the benefit of purchasing companies, including those designed to restrict the annuitant's ability to contract with the purchaser's competitors.[7]

*** 

This matter represents the intersection of two public policy concerns. *First*, the General Assembly enacted a statute designed to promote a public policy favoring enforcement of arbitration agreements. In doing so, the General Assembly curtailed the role of the courts with respect to arbitrable disputes.

*Second*, the press coverage concerning the facts and circumstances of this case caught the attention of the General Assembly, prompting it to amend the MSSPA in 2016 to provide further protections and regulatory control over such assignment transactions.

---

[7] For example, section 3.13 of the Purchase Agreement states:

> Except as specifically and expressly disclosed to Purchaser in writing in connection with this Transaction, Seller has not, and has not attempted to, sell, assign, transfer, or convey any of the Settlement Payments to any other person or entity, nor has Seller attempted to pledge, encumber or mortgage the Settlement Payments with or to any other person or entity. To the extent that Seller has previously had discussions or negotiations with other persons or entities regarding the possible sale, assignment, transfer, mortgage, encumbrance, pledge or other conveyance of the Settlement Payments, Seller hereby represents and warrants that all such discussions or negotiations have ceased and any and all contracts, agreements, letters of intent and other documents relative to said discussions and/or negotiations have been cancelled, terminated, and rescinded. Upon signing this Agreement, Seller shall deal exclusively with Purchaser regarding the Assigned Payments.

This clause is clearly designed, at least in part, to gain a competitive advantage over Purchaser's competitors. I am not suggesting that this clause is, or should be, deemed unenforceable. That issue is not before us. Rather, I am simply pointing out that the MSSPA should not be construed as requiring the court to review and approve each provision of a purchase agreement.

12

That amendment reflected public policy choices that are rightfully committed to the discretion of the General Assembly. Notably, even in the recent amendment, the General Assembly did not see fit to exempt arbitration clauses in such agreements from the public policy of enforcing arbitration agreements.

Thus, to the extent that matters of public policy are lurking in the background or under the surface of this case, it bears noting that, as articulated by the General Assembly, the public policies implicated in this case favor enforcement of the arbitration clause. More importantly, in my view, the governing legal principles require it.

Accordingly, for the reasons stated above, I respectfully dissent.